**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| PAR PHARMACEUTICAL, INC.,<br>PAR STERILE PRODUCTS, LLC and<br>ENDO PAR INNOVATION COMPANY, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>BAXTER HEALTHCARE CORPORATION,<br><br>Defendant. | ) | C.A. No. 23-cv-00358-GBW-SRF |

# JOINT CLAIM CONSTRUCTION BRIEF


Kaan Ekiner (#5607)
**COZEN O'CONNOR**
1201 N. Market Street, Suite 1001
Wilmington, DE 19801
(302) 295-2046
kekiner@cozen.com

*Of Counsel:*

W. Blake Coblentz
Aaron S. Lukas
Kerry B. McTigue
**COZEN O'CONNOR**
1200 19th Street, NW
Washington, DC 20036

Keri L. Schaubert
**COZEN O'CONNOR**
3 WTC, 175 Greenwich Street, 55th Floor
New York, NY 10007

Madison McNulty
**COZEN O'CONNOR**
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, PA 19103

*Attorneys for Plaintiffs Par Pharmaceutical,*

Philip A. Rovner (#3215)
**POTTER ANDERSON & CORROON LLP**
Hercules Plaza
P.O. Box 951
Wilmington, DE 19899
(302) 984-6000
provner@potteranderson.com

*Of Counsel:*

Paul J. Molino
Kevin Warner
Katie A. Boda
Greg L. Goldblatt
**RAKOCZY MOLINO MAZZOCHI SIWIK LLP**
6 West Hubbard Street, Suite 500
Chicago, IL 60654
(312) 527-2157

*Attorneys for Defendant Baxter Healthcare Corporation*

*Inc., Par Sterile Products, LLC and Endo Par Innovation Company, LLC*

Dated: August 9, 2024

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ..... 1

A. Plaintiffs' Opening Claim Construction Brief ..... 1

B. Defendant's Answering Claim Construction Brief ..... 2

C. Plaintiffs' Reply Claim Construction Brief ..... 4

D. Defendant's Sur-Reply Claim Construction Brief ..... 4

II. AGREED-UPON CONSTRUCTIONS ..... 5

III. DISPUTED CONSTRUCTIONS ..... 5

A. "providing … storing … administering" ..... 6

1. Plaintiffs' Opening Position ..... 6

a. Issue Presented ..... 8

b. Background ..... 8

c. Argument ..... 12

2. Defendant's Answering Position ..... 15

a. The claim language supports Baxter's proposed construction ..... 17

b. The specification supports Baxter's proposed construction ..... 20

c. The prosecution history supports Baxter's proposed construction ..... 22

i. Par Added the Step of Storing After Providing to Obtain Allowance ..... 23

ii. The Examiner Understood that Storing Follows the "Providing" Step ..... 24

iii. Par Made the Same Amendment in Related Patents to Obtain Allowance ..... 26

d. Plaintiffs' proposed construction provides no clarity ..... 28

e. The Cases Par Cites are Distinguishable ..... 31

f. Because the intrinsic evidence is clear there is no reason to consider the extrinsic expert declaration ..... 33

g. A skilled person would understand that the claims require the order proposed by Baxter ..... 33

3. Plaintiffs' Reply Position ..... 35

a. Baxter has not shown that the claim language or the specifications support its proposed construction ..... 35

b. The file history does not support Baxter's construction ..... 42

c. Unlike Baxter's proposed construction, Plaintiffs proposed construction is faithful to the intrinsic record ........ 46

d. A skilled artisan would understand that "providing, … storing, … administering" need not be performed in that order ........ 46

4. Defendant's Sur-Reply Position ........ 47

a. Par ignores the intrinsic evidence because it supports Baxter's proposed construction ........ 48

i. The claim language supports Baxter's proposed construction ........ 48

ii. The specification supports Baxter's proposed construction ........ 50

iii. The prosecution history supports Baxter's proposed construction ........ 51

b. Par's other arguments are unpersuasive ........ 53

B. "unit dosage form" ........ 55

1. Plaintiffs' Opening Position ........ 55

a. Issue Presented ........ 55

b. Background ........ 56

c. Argument ........ 56

2. Defendant's Answering Position ........ 61

a. The claim language supports Baxter's proposed construction ........ 61

b. The specification supports Baxter's proposed construction ........ 63

c. The prosecution history supports Baxter's proposed construction ........ 64

d. Plaintiffs' proposed construction is inconsistent with their proposed construction of "providing … storing … administering." ........ 65

3. Plaintiffs' Reply Position ........ 67

a. The claim language and specification do not support Baxter's construction ........ 67

b. The file history does not support Baxter's construction ........ 68

c. Plaintiffs' proposed constructions are not inconsistent ........ 68

4. Defendant's Sur-Reply Position ........ 70

IV. CONCLUSION ........ 72

A. Plaintiffs' Conclusion ........ 72

B. Defendant's Conclusion ........ 72

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
694 F.3d 1312 (Fed. Cir. 2012)....7, 15, 60, 68

*Akamai Techs., Inc. v. Limelight Networks, Inc.*,
805 F.3d 1368 (Fed. Cir. 2015).... 4, 6, 56, 68-69

*Altiris, Inc. v. Symantec Corp.*,
318 F.3d 1363 (Fed. Cir. 2003)....10, 11, 14, 32-33, 35, 38-39

*Amgen Inc .v. Sandoz Inc.*,
923 F.3d 1023 (Fed. Cir. 2019)....4, 16, 17, 36, 54

*Aventis Pharms. Inc. v. Amino Chems. Ltd.*,
715 F.3d 1363 (Fed. Cir. 2013)....4, 6, 35, 57, 67, 68

*Azurity Pharms., Inc. v. Amneal Pharms. LLC*,
No. 21-08717 (GC), 2022 WL 3691392 (D.N.J. Aug. 25, 2022)....16, 33

*Bd. Of Regents Univ. Tex. v. BENQ Am. Corp.*,
533 F.3d 1362 (Fed. Cir. 2008)....66

*Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*,
616 F.3d 1249 (Fed. Cir. 2010)....66

*Bio-Rad Lab'ys, Inc. v. 10X Genomics, Inc.*,
496 F. Supp. 3d 563 (D. Mass. 2020)....32

*Biogen Idec, Inc. v. GlaxoSmithKline LLC*,
713 F.3d 1090 (Fed. Cir. 2013).... 16, 23-24

*Chiesi USA Inc. v. MSN Pharms. Inc.*,
No. 19-18564, 2021 WL 4843806 (D.N.J. Oct. 18, 2021) ....17, 19, 36, 54

*E-Pass Techs., Inc. v. 3Com Corp.*,
473 F.3d 1213 (Fed. Cir. 2007)....32

*Fraser v., High Liner Foods, Inc.*,
No. 06-11644-RWZ, 2008 WL 8920211 (D. Mass. July 10, 2008) .... 27-28

*Fraser v. High Liner Foods (USA), Inc.*,
337 F. App'x 883 (Fed. Cir. 2009) ....28

*Hill-Rom Serv., Inc. v. Stryker Corp.*,
755 F.3d 1367 (Fed. Cir. 2014)....4, 6, 56, 68

*Hytera Commc'ns Co. Ltd. v. Motorola Sols., Inc.*,
841 F. App'x 210 (Fed. Cir. 2021) .......... 18, 22, 37, 38, 53-54

*Intell. Ventures II, LLC v. AT & T Corp.*,
Nos. 13-cv-116-LY, 13-cv-118-LY, 13-cv-119-LY, 2015 WL 4138590
(W.D. Tex. July 8, 2015) .......... 18, 39-40

*Interactive Gift Express, Inc. v. CompuServe Inc.*,
256 F.3d 1323 (Fed. Cir. 2001).......... 10-11, 31, 35, 39, 59

*Kaneka Corp. v. Xiamen Kingdomway Grp. Co.*,
790 F.3d 1298 (Fed. Cir. 2015)..........32

*Loral Fairchild Corp. v. Sony Corp.*,
181 F.3d 1313 (Fed. Cir. 1999)..........10, 16

*Mantech Env't Corp. v. Hundson Env't Servs., Inc.*,
152 F.3d 1368 (Fed. Cir. 1998)..........19, 32, 41, 54

*Markman v. Westview Instruments, Inc.*,
52 F.3d 967 (Fed.Cir.1995) (*en banc*), *aff'd* 517 U.S. 370 (1996)..........6, 16

*Mentor H/S, Inc. v. Medical Device Alliance, Inc.*,
244 F.3d 1365 (Fed. Cir. 2001)..........7, 67, 68

*Microsoft Corp. v. Multi-Tech Sys., Inc.*,
357 F.3d 1340 (Fed. Cir. 2004)..........26, 63

*Nippon Shinyaku Co., Ltd. v. Sarepta Therapeutics, Inc.*,
No. 21-1015-GBW, 2023 WL 4314485 (D. Del. July 2, 2023) .......... 11-12, 32, 62

*NTP, Inc. v. Rsch. In Motion, Ltd.*,
418 F.3d 1282 (Fed. Cir. 2005)..........26, 63

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
521 F.3d 1351 (Fed. Cir. 2008)..........7

*In re Papst Licensing Digit. Camera Pat. Litig.*,
778 F.3d 1255 (Fed. Cir. 2015)..........30

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005)..........3, 4, 6, 16, 33, 35, 53, 56

*Schoenhaus v. Genesco, Inc.*,
440 F.3d 1354 (Fed. Cir. 2006)..........66

*Standard Oil Co. v. Am. Cyanamid Co.*,
774 F.2d 448 (Fed. Cir. 1985)..........24

*Summit 6, LLC v. Samsung Elecs. Co.*,
802 F.3d 1283 (Fed. Cir. 2015)....................7, 15, 60, 67, 68

*Techno View IP Inc. v. Oculus VR LLC*,
No. 17-386-VAC-CJB, 2018 WL 4141032 (D. Del. Aug. 30, 2018)....................18, 39

*Thermolife Int'l, LLC v. Myogenix Corp.*,
No. 13-651, 2014 WL 12160740 (S.D. Cal. Dec. 2, 2014)....................70

*Thorner v. Sony Computer Ent. Am. LLC*,
669 F.3d 1362 (Fed. Cir. 2012)....................4, 6, 56, 68

*Traxcell Techs., LLC v. Nokia Sols. & Networks Oy*,
15 F.4th 1136 (Fed. Cir. 2021)....................22-23

*Tuna Processors, Inc. v. Hawaii Int'l Seafood, Inc.*,
327 F. App'x 204 (Fed. Cir. 2009)....................19, 41-42

*Typhoon Touch Techs., Inc. v. Dell, Inc.*,
659 F.3d 1376 (Fed. Cir. 2011)....................30

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996)....................33, 53

*Wi-Lan, Inc. v. Apple, Inc.*,
811 F.3d 455 (Fed. Cir. 2016)....................17, 22, 62

*Zapmedia Serv., Inc. v. Apple Inc.*,
No. 08-104, 2010 WL 2036406 (E.D. Tex. May 19, 2010)....................19-20, 41-42, 54

*Zapmedia Serv., Inc. v. Apple, Inc.*,
No. 08-104, 2010 WL 8599970 (E.D. Tex. Aug. 19, 2010)....................19, 41-42

**Other Authorities**

*Par Pharm., Inc. v. Eagle Pharms., Inc.*,
No. 18-cv-823-CFC-JLH, D.I. 63 (D. Del. May 11, 2019)....................21

Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/provide....................9

## DEFENDANT'S TABLE OF ABBREVIATIONS

| Term | Abbreviation |
|---|---|
| U.S. Patent No. 9,993,520 | '520 patent |
| U.S. Patent No. 11,135,265 | '265 patent |
| U.S. Patent No. 11,207,372 | '372 patent |
| U.S. Patent No. 9,981,006 | '006 patent |
| U.S. Patent No. 9,962,422 | '422 patent |
| U.S. Patent No. 9,968,649 | '649 patent |
| U.S. Patent No. 10,010,575 | '575 patent |
| File History Excerpts | FH |
| U.S. Application No. 15/612,649 | '649 application |
| Plaintiffs' Opening Claim Construction Brief | "Par Op." or "Op." |
| Baxter's Answering Claim Construction Brief | Ans. |
| Plaintiffs' Reply Claim Construction Brief | Reply |
| Declaration of Zlatan Coralic in Support of Plaintiffs' Opening Claim Construction Brief | Coralic |
| Declaration of Zlatan Coralic in Support of Plaintiffs' Reply Claim Construction Brief | Coralic Reply |
| Declaration of Michael Freudiger in Support of Baxter's Answering Claim Construction Brief | Freudiger |
| Person of Ordinary Skill in the Art | POSA |

Pursuant to Paragraph 10 of the Scheduling Order (D.I. 49), Plaintiffs Par Pharmaceutical, Inc., Par Sterile Products, LLC, and Endo Par Innovation Company, LLC (collectively, "Par" or "Plaintiffs"), and Defendant Baxter Healthcare Corporation ("Baxter" or "Defendant") jointly submit this claim construction brief.

# I. INTRODUCTION

## A. Plaintiffs' Opening Claim Construction Brief

Plaintiffs Par Pharmaceutical, Inc., Par Sterile Products, LLC, and Endo Par Innovation Company, LLC (collectively, "Plaintiffs") assert that the use of Baxter Healthcare Corporation's ("Baxter") Vasopressin in 0.9% Sodium Chloride Injection product ("Baxter's Vasopressin Product") that is currently marketed and sold in the United States and is described in New Drug Application ("NDA") No. 217569 infringes claims 1, 4-9, and 13 of U.S. Patent No. 9,993,520 ("the '520 patent," D.I. 94, Ex. 1), claims 1-4, 7-14, and 16 of U.S. Patent No. 11,135,265 ("the '265 patent," D.I. 94, Ex. 2), and claims 1-3 and 6-13 of U.S. Patent No.11,207,372 ("the '372 patent," D.I. 94, Ex. 3) (collectively, the "Asserted Claims" of the "Patents-in-Suit")[1].

Vasopressin is a synthetic polypeptide hormone that, upon administration, constricts blood vessels throughout the body and is used clinically to raise the blood pressure of patients in vasodilatory shock, among other conditions. (D.I. 94, Ex. 1 ('520 patent) at col. 7:11-29, col. 7:57 – col. 8:35, col. 69:7-57; Coralic Decl.[2] ¶ 10.) When placed in aqueous solution, vasopressin can undergo degradation by a variety of mechanisms. (D.I. 94, Ex. 1 ('520 patent) at col. 5:50 – col.

[1] The Patents-in-Suit are all from the same patent family and share a common specification. For ease of reference, Plaintiffs cite to the disclosures as found in the '520 patent. The same disclosures can be found each of the other Patents-in-Suit.

[2] References to "Coralic Decl." herein refer to the Declaration of Zlatan Coralic, Pharm.D., BCPS, FASHP that is being filed in conjunction herewith.

7:10, Table 1.) As a result, prior art vasopressin formulations were concentrated solutions that, once diluted for intravenous administration to patients, could only be used for up to 24 hours before degradants made them unsuitable for use. *See id.*, col. 67:20-32. The Patents-in-Suit relate to the inventors' development of premixed, ready-to-use vasopressin formulations having enhanced stability characteristics, which enable ready-to-use vasopressin formulations to be stored for up to 24 months. *Id.* at col. 48:36-56, col. 52:42-62, col. 117:26 – col. 163:3, Example 17, Tables 65-72, Figs. 29-48; Coralic Decl. ¶ 12.

**B. Defendant's Answering Claim Construction Brief**

Par currently asserts that the use of Baxter's Vasopressin in 0.9% Sodium Chloride Injection Product (Baxter's Product") infringes the '520 patent, '265 patent and '372 patent (collectively, the "Patents-in-Suit") only under the doctrine of equivalents. Through the claim construction process, Par improperly seeks litigation-driven constructions of two terms in certain of the asserted claims.

First, the parties dispute whether the step of "providing" the claimed unit dosage form of the '520 and '372 patents must come before the claimed step of "storing." It is undisputed that vasopressin is an old drug with a crowded intellectual property landscape. As a result, during prosecution of the Patents-in-Suit, Par had no choice but to repeatedly limit and narrow their claimed invention to avoid prior art. This included even their own prior art Vasostrict® vasopressin product, which Par was forced to avoid by narrowing the claims to add "a step of storing the vasopressin for at least about 24 hours *after* providing the unit dosage form and before administering." (D.I. 94, Ex. 9 ('520 patent FH at 10) (emphasis added)). Now—after having unequivocally narrowed the claims to a "providing" step that comes *before* the storage step in order to obtain allowance—Par ignores their own statements during patent prosecution in an effort to expand the scope of the claims in a litigation driven attempt to secure a claim construction that

Par argues ensnares Baxter's product. As detailed below, the claims, specification and file history all support Baxter's construction that the claimed "providing" step must come before the claimed "storage" step.

Second, the parties dispute whether the "unit dosage form" initially recited in the claims of the Patents-in-Suit must be the same unit dosage form that is administered to the patient. The question is again answered by Par's actions during prosecution and reflected in the issued claims: Par amended the claims to make clear that the first-listed unit dosage form must be administered to patients, and did so to overcome a rejection for indefiniteness. Again, however, Par now ignores this file history and the issued claims in an attempt to avoid the consequences of their own actions to get the claims issued. That is not permissible under the basic tenets of claim construction. Par must be held to its own statements during prosecution.

Instead of discussing the intrinsic evidence that unambiguously supports Baxter's proposed constructions, Par has no choice but to rely upon the least reliable form of extrinsic evidence—an expert declaration that ignores how a person of ordinary skill in the art would understand claim terms *in light of the intrinsic evidence. Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005) (*en banc*). ("[A] court should discount any expert testimony that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history.")

All of these strategies amount to an improper attempt to stretch the disputed claim terms to suit Par's litigation desires. Controlling case law, the intrinsic evidence, and expert testimony submitted on behalf of Baxter confirm that Baxter's claim construction proposals are correct.

**C. Plaintiffs' Reply Claim Construction Brief**

Baxter fails to carry its heavy burden to justify deviating from the ordinary meanings of the disputed claim terms in this case. *See Aventis Pharms. Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013) ("There is a heavy presumption that claim terms are to be given their ordinary and customary meaning."). Federal Circuit precedent makes clear that there are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his or her own lexicographer; or 2) when the intrinsic record provides an unmistakable disavowal of claim scope. *See, e.g., Hill-Rom Serv., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014); *Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012); *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 805 F.3d 1368, 1375-76 (Fed. Cir. 2015). Neither exception applies to the terms at issue here, and Baxter cannot overcome the presumption that the disputed claim terms should be construed to have their ordinary meanings. *See Aventis Pharms.*, 715 F.3d at 1373.

**D. Defendant's Sur-Reply Claim Construction Brief**

Process claims are limited to a certain order of steps "when the claim language, as a matter of logic or grammar, requires that the steps be performed in the order written, or the specification directly or implicitly requires an order of steps." *Amgen Inc .v. Sandoz Inc.*, 923 F.3d 1023, 1028 (Fed. Cir. 2019) (internal quotation omitted). Federal Circuit precedent stresses that claim terms do not exist in vacuum and must be "read ... not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313. Here the intrinsic evidence is clear that the claimed "providing" step is not akin to physically moving the claimed unit dosage form or, as Par puts it, "making it available." It instead corresponds to when the unit dosage form, which can be stored for at least about 24 hours, is made with the claimed ingredients and vasopressin concentration. That is what the patentee claims as the invention, as reflected in the claim language, specification and prosecution

history. For this reason, the providing step necessarily occurs first. This construction is supported by precedent and logic.

Par and Dr. Coralic continue to parrot the unremarkable and irrelevant fact that medicines move throughout hospitals to twist the meaning of the "providing" and "storing" terms to suit their litigation needs. (*Infra* at 43). That understanding is completely removed from the context of the Patents-in-Suit, which have nothing to do with how drugs move within a hospital system.

## II. AGREED-UPON CONSTRUCTIONS

The Parties agree that the term "about 1 mM to about 10 mM acetate buffer," as used in claims 1 and 4-9 of the '520 patent and claims 1-4 and 7-14 of the '265 patent, means "a solution containing a mixture of acetic acid and acetate, with a total concentration of about 1 mM to about 10 mM, that is capable of resisting change in pH upon the addition of acidic or basic substances." *See* Joint Claim Construction Chart ("JCCC," D.I. 94) at B-1.

The Parties further agree that the term "about 10 mM acetate buffer," as used in claim 13 of the '520 patent and claim 16 of the '265 patent, means a "a solution containing a mixture of acetic acid and acetate, with a total concentration of about 10 mM, that is capable of resisting change in pH upon the addition of acidic or basic substances." *Id.*

Finally, the Parties agree that the term "acetate buffer," as used in claims 1-3 and 6-13 of the '372 patent, means "a solution containing a mixture of acetic acid and acetate that is capable of resisting change in pH upon the addition of acidic or basic substances." *Id.*

## III. DISPUTED CONSTRUCTIONS

The Parties dispute the constructions for two claim terms: "providing … storing … administering" and "unit dosage form." *See* D.I. 94 (JCCC) at A-1, A-3.

### A. "providing … storing … administering"

#### 1. Plaintiffs' Opening Position

The purpose of claim construction is to "determin[e] the meaning and scope of the patent claims asserted to be infringed." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (*en banc*), *aff'd* 517 U.S. 370 (1996). The words of a claim are generally given their ordinary and customary meaning, which is the meaning a term would have to a person of ordinary skill in the art after reviewing the intrinsic record at the time of the invention. *See Phillips*, 415 F.3d at 1312-13.

Plaintiffs contend that that the disputed terms—"providing … storing … administering" and "unit dosage form"—*as recited in the Asserted Claims*, would be readily understood by one of skill in the art, and therefore do not require any construction. Baxter does not disagree that the words, as used in the Asserted Claims would be understood by a skilled artisan, but instead seeks to rewrite the Asserted Claims by inserting additional limitations. But Baxter's proposed constructions do nothing to clarify the ordinary meaning of the disputed terms, as required by *Phillips*. *See id*. Rather, Baxter's proposed constructions appear to be an attempt to bolster its noninfringement defenses. That is not the purpose of claim construction.

Further, Federal Circuit precedent makes clear that narrowing constructions are appropriate in only two circumstances: (1) where the patentee acts as a lexicographer and clearly defines a term in question; or (2) where the intrinsic record provides an unmistakable disavowal of claim scope. *See, e.g., Hill-Rom Serv.*, 755 F.3d at 1371; *Thorner*, 669 F.3d at 1365; *Akamai*, 805 F.3d at 1375-76. Neither exception applies to the terms at issue here, and Baxter cannot overcome the heavy presumption that the disputed terms are to be afforded their ordinary meaning. *See Aventis Pharms.*, 715 F.3d at 1373 ("There is a heavy presumption that claim terms are to be given their ordinary and customary meaning.").

While the court must resolve actual disputes regarding the proper scope of a claim term, that is not the case here. *Cf. O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008). Instead, in rejecting Baxter's proposed constructions, it would be entirely proper for the Court to simply confirm that the terms shall have their ordinary meaning because they are "straightforward terms" that require no construction. *See Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1291 (Fed. Cir. 2015); *see also, e.g., Mentor H/S, Inc. v. Medical Device Alliance, Inc.*, 244 F.3d 1365, 1380 (Fed. Cir. 2001) ("defendants argue that the court committed reversible error by refusing to construe the claim terms 'irrigating' and 'frictional heat.' … . We agree … the district court did not err in relying on the ordinary meanings of these terms."); *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1326 (Fed. Cir. 2012) ("[t]he district court did not err in concluding that these terms have plain meanings that do not require additional construction," and "ActiveVideo's proposed construction erroneously reads limitations into the claims and the district court properly rejected that construction and resolved the dispute between the parties.").

Alternatively, if the Court wishes to provide an express construction, Plaintiffs respectfully submit that the Court should adopt their proposed constructions, which reflect the ordinary meaning of the disputed terms, consistent with the words of the claims themselves, the specifications of the Patents-in-Suit, and their prosecution histories.

For the reasons set forth herein, the Court need not provide an express construction for the terms in dispute, beyond confirming that they shall each be given their ordinary meaning. In doing so, Plaintiffs respectfully request that the Court reject Baxter's attempts to insert additional limitations into the Asserted Claims. *See, e.g.*, *Summit 6*, 802 F.3d at 1291. Alternatively, if the Court wishes to provide an express construction, it should adopt the language Plaintiffs propose,

*see* D.I. 94 (JCCC) at A-1, A-3, which reflects the ordinary meaning of the disputed terms, consistent with the above case law.

| Plaintiffs' Proposed Construction | Baxter's Proposed Construction |
|---|---|
| No construction necessary<br>In the alternative, plain and ordinary meaning, which is the claimed method includes making the unit dosage form available for use, storing it prior to use, and using it by intravenously administering it to the patient | Construction necessary only because the parties appear to dispute the plain and ordinary meaning, which is that the steps must occur in this order: providing, then storing, then administering |

**a. Issue Presented**

Plaintiffs contend that the Court need not provide an express construction for "providing … storing … administering" as the ordinary meaning of this term is clear on its face. *See* D.I. 94 (JCCC) at A-1. Conversely, Baxter seeks to go beyond the ordinary meaning of this term by proposing that the claimed "providing … storing … administering" steps "must occur" in a particular order: "providing, ***then*** storing, ***then*** administering." *Id.* (emphasis added). The Court should reject Baxter's proposed construction as inconsistent with the plain language in the claims, untethered to the intrinsic evidence, and entirely at odds with the reality of critical care centers, and give this term its ordinary meaning. To the extent the Court deems it necessary to provide an express construction, Plaintiffs respectfully submit that the Court should adopt the language Plaintiffs propose—i.e., that "the claimed method includes making the unit dosage form available for use, storing it prior to use, and using it by intravenously administering it to the patient."

**b. Background**

Claim 1 of the '520 and '372 patents recite a method of treatment that, at a high level, includes three steps: "providing" the claimed ready-to-use vasopressin unit dosage form, "storing" the claimed ready-to-use vasopressin unit dosage form, and "administering" the claimed ready-to-

use vasopressin unit dosage form to a patient. *See* D.I. 94, Ex. 1 ('520 patent), claim 1; D.I. 94, Ex. 3 ('372 patent), claim 1.

A POSA would understand that, in the ordinary course of the manufacture, sale, distribution, and eventual use of vasopressin products (and other pharmaceuticals), the products will be "provided"—i.e., made available, supplied, or furnished[3]—at various times, all for the purpose of ultimately administering them to patients. After being manufactured, for example, the products are provided by the manufacturer to a shipper or distributor, who then provides them to the buyer (in this case a hospital or other acute care facility), where they are received by pharmacy staff, who then provide them to clinicians for administration to patients (in the manner described in detail in the Declaration of Dr. Zlatan Coralic being filed herewith).

Most pertinent to the claimed invention, vasopressin products are provided for the use recited in the claims (intravenous administration to a patient) when they are provided / made available / supplied / furnished by hospital pharmacy staff to clinicians. *See* Coralic Decl. ¶¶ 14-18, 25-28. As Dr. Coralic explains, this can be done in different ways, such as when pharmacy staff provides a product directly to a clinician from a central pharmacy site or a decentralized pharmacy on a hospital floor, or when pharmacy staff stocks a product in an automated dispensing cabinet on a hospital floor for later retrieval and use by a clinician. *Id.*

Moreover, in addition to being "provided" to others at various points along the way, vasopressin products will be "stored" in various different places at various different times in the ordinary course of their journey from manufacture to eventual use. For example, the claimed vasopressin products may be stored by the manufacturer following manufacturing prior to sale and

---

[3] *See, e.g.*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/provide (definition of "provide" includes, in relevant part, "to supply or make available (something wanted or needed)").

shipment; they may be stored by the shipper/distributor before being delivered to the buyer/hospital; and as Dr. Coralic explains, they may thereafter be stored within the hospital. *Id.* Most pertinent to the claimed invention, vasopressin products can be stored within the hospital (in the central pharmacy, decentralized hospital locations, and/or within automated dispensing machines) both before and after they are provided to a clinician for use. *Id*. For example, upon receipt, a ready-to-use vasopressin unit dosage form may first be placed in a refrigerator within the central pharmacy; then as stock on a hospital floor gets depleted, the pharmacy staff may use it to re-stock an automated dispensing cabinet on the floor; then, it will remain stored in that automated dispensing cabinet until it is needed, at which time a clinician will retrieve it and administer it to a patient. *Id.*

As this discussion makes clear, persons skilled in the art recognize and understand that in the ordinary course, vasopressin products will be provided and stored on multiple occasions and multiple different places and points in time before they are ultimately used to treat patients. *Id*.

Further, it is well-settled that "[u]nless the steps of a method actually recite an order, the steps are not ordinarily construed to require one." *Interactive Gift Express, Inc. v. CompuServe Inc.*, 256 F.3d 1323, 1342 (Fed. Cir. 2001) (citing *Loral Fairchild Corp. v. Sony Corp*., 181 F.3d 1313, 1322 (Fed. Cir. 1999) (stating that "not every process claim is limited to the performance of its steps in the order written.")). The Federal Circuit applies a "two-part test for determining if the steps of a method claim that do not otherwise recite an order, must nonetheless be performed in the order in which they are written." *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1369 (Fed. Cir. 2003). "First, [the court] look[s] to the claim language to determine if, as a matter of logic or grammar, they must be performed in the order written." *Id.* (citing *Interactive Gift*, 256 F.3d at 1343). "If not, [the court] next look[s] to the rest of the specification to determine whether it

'directly or implicitly requires such a narrow construction.'" *Id.* at 1370 (quoting *Interactive Gift*, 256 F.3d at 1343). If the specification does not directly or implicitly require such a narrow construction, "the sequence in which such steps are written is not a requirement." *Id.*

Under the first step, case law makes clear that in order for the logic and grammar of the claim to dictate a particular order, one method step must be a necessary prerequisite to another step. In *Mformation*, for example, the court construed the claim at issue as requiring that the step of "transmitting" specified information had to occur after the step of "establishing" the connection used to transmit it, because the connection must be established first, before information can actually be transmitted over that connection. *Mformation*, 764 F.3d at 1399. But this is the exception rather than the rule. In *Interactive Gift*, the Federal Circuit reversed a district court's finding that the claimed step of "providing" information had to occur before the step "receiving the request reproduction code." 256 F.3d at 1343. It held that "nothing in the claim or the specification directly or implicitly requires such a narrow construction," because "[l]ogically, information could be sent after a request is made." *Id.* Indeed, even where the specification consistently described two steps as occurring in a particular order, the Federal Circuit reversed a district court's finding that the claims required that they be performed in that order. *Altiris*, 318 F.3d at 1370-71 (finding that "setting said boot selection flag" step could occur at any time, not only before "booting normally" as the district court construed).

In *Nippon Shinyaku Co., Ltd. v. Sarepta Therapeutics, Inc.*, No. 21-1015-GBW, 2023 WL 4314485, at *14-16 (D. Del. July 3, 2023), this Court applied that reasoning in finding that the steps of "e) reacting said Compound 3 with a deprotecting agent to form Compound 4" and "f) reacting [said] Compound 4 with an acid to form said oligomer [or PMO]" (collectively, the "Reaction Terms") need not to be performed in a particular order. As the court noted, "nothing in

the … patent's intrinsic record requires that the claimed method be performed in a particular order of steps, as [Defendant] contends." *Id.* at *50; *see also id.* at *53-54 ("nothing in the intrinsic record demonstrates a clear intention to limit the Reaction Terms to being performed sequentially without alteration.").

**c. Argument**

There is no basis in logic, grammar, or the specification for requiring that "providing … storing … administering" steps "must occur" in that order, and, more specifically, that the "providing" step "must occur" before the "storing" step. To the contrary, as explained above, a POSA would understand that logically, after vasopressin products are first made they will be *stored* by the manufacturer for some period of time before they are ever *provided* to the shipper/distributor or to anyone else. Consequently, Baxter's proposed construction would exclude each and every one of these instances of "providing" from the scope of the claims, because the "providing" occurs after the initial "storing" by the manufacturer. This is nonsensical within the context of the claimed inventions. Similarly, a POSA would understand that in the context most pertinent to the claimed use of the vasopressin product (i.e., administration to patients), the unit dosage form can be stored at the hospital *both before and/or after* the pharmacy staff has provided it to clinicians for such use. *See* Coralic Decl. ¶¶ 17, 18, 26, 27. And on those occasions when the hospital pharmacy staff takes the unit dosage form out of a refrigerator (i.e., out of storage) and distributes it (i.e., provides it) directly to a clinician for administration to a patient in an emergency room (*see id.*), the only times that the unit dosage form will have been stored will have been before the pharmacy staff provides it to the clinician for administration. Again, Baxter's proposed construction would exclude these instances from the claim scope.

The fact of the matter is that a POSA would recognize that in the ordinary course, vasopressin products will be provided (e.g., made available, supplied, furnished) and stored

multiple times in multiple different places during the time between when they are manufactured and when they are administered to patients. Coralic Decl. ¶¶ 14-18, 25-28. For example, the unit dosage form can be stored by the manufacturer, then provided to a shipper/distributor, who can then store the unit dosage form before providing it to the receiving department at a hospital, who then provides the unit dosage form to the hospital's pharmacy staff, who can store it before providing the unit dosage form to clinicians, where it can be stored before being administered to patients. *Id*. Any of those instances of "providing" the vasopressin product can potentially satisfy the "providing" step of the asserted claims, and any of those instances of storage can potentially satisfy the "storing" step. Thus, while it is necessarily true that the "administering" step comes after the "providing" and "storing" steps—because logically the unit dosage form cannot be stored or provided to others after it has been injected into the body of a patient (i.e., intravenously administered)—that same logic does not apply to the "providing" and "storing" steps, which as a matter of both logic and practical reality need not occur in any particular order.

Further, and significantly, when the inventors wanted to dictate that the steps of the claim "must occur" in a particular order, they knew how to do so. In claim 1 of the '520 patent, for instance, the inventors recited in relevant part:

> 1. A method of increasing blood pressure …, the method comprising:
> ***providing*** a unit dosage form …; and
> ***storing*** the unit dosage form …; and
> ***after the storing, administering*** the unit dosage form to the human …;
> wherein: ….

D.I. 94, Ex. 1 ('520 patent), claim 1 (emphasis added); *see also* D.I. 94, Ex. 3 ('372 patent),

claim 1[4]. The plain language of claim 1 of the ’520 patent makes clear that the “administering” step must occur “after the storing” of the unit dosage form. D.I. 94, Ex. 1 (’520 patent), claim 1; *see also* D.I. 94, Ex. 3 (’372 patent), claim 1. Notably, the inventors did not include similar language in any claim of the ’520 or ’372 patents with respect to the order of the “providing” and “storing” steps. That is, for the “storing” step, the asserted claims of the ’520 and ’372 patents do *not* recite “after the providing, storing the unit dosage form…” or anything akin to it. And while it is true the “providing” step appears first in claim 1 of each of the ’520 and ’372 patents, the Federal Circuit makes clear that the order in which method steps are recited in a claim does *not* dictate that those must be performed in the recited order. *Mformation*, 764 F.3d at 1398-99. In fact, the opposite is true—the law presumes that the steps need *not* be performed in the recited order. *Id*.

Nor is there any disclosure in the specifications of the ’520 or ’372 patents that directly or implicitly requires Baxter’s narrowed construction, i.e., that the “storing” step “must occur” *after* the “providing” step. *See, generally*, D.I. 94, Ex. 1 (’520 patent) and Ex. 3 (372 patent); *see also Altiris*, 318 F.3d at 1370. Moreover, the prosecution history of the ’520 patent likewise demonstrates that inventors did *not* intend for the providing and storing steps to occur in a particular order, and that the examiner understood as much. For example, during prosecution of the application leading to the ’520 patent, applicants specifically amended claim 1 to include the language “***storing*** the unit dosage form for at least about 24 hours at from about 0.1 units/ml to about 1 unit/ml of vasopressin or a pharmaceutically-acceptable salt thereof; and c) ***after the storing***,--.” (*See* D.I. 94, Ex. 9 (’520 Patent File History Excerpts, Notice of Allowance,

[4] D.I. 94, Ex. 3 (’372 patent), claim 1 (emphasis added): “A method of increasing blood pressure …, the method comprising ***providing*** a unit dosage form …; … ***storing*** the unit dosage form …; ***after the storing, intravenously administering*** the unit dosage form to the human; wherein ….”

Examiner's Amendment) at 17[5] (emphasis added).) Applicants could also have recited that the "storing" step occurs *after* the "providing" step when amending the claims, but chose not do so. Accordingly, the intrinsic record does not support Baxter's narrow construction.

In short, the claimed "providing … storing … and administering" term, *as drafted*, would be readily understandable to one skilled in the art and Baxter's rigid view of the claim is not supported by any disavowal or lexicography in the intrinsic record. For at least these reasons, Plaintiffs respectfully submit that the Court should reject Baxter's proposed construction and find that no further construction is necessary. *See, e.g., ActiveVideo*, 694 F.3d at 1326; *Summit 6*, 802 F.3d at 1291. Alternatively, if the Court wishes to provide an express construction, Plaintiffs respectfully submit that the Court should adopt their proposed language, which reflects the ordinary meaning of the term, consistent with the above-discussed intrinsic record.

**2. Defendant's Answering Position**

The terms "providing … storing … administering" appear in claim 1 of the '520 patent and claim 1 of the '372 patent. The parties have proposed the following constructions for the term:

| Par's Proposed Construction | Baxter's Proposed Construction |
|---|---|
| No construction necessary<br><br>In the alternative, plain and ordinary meaning, which is the claimed method includes making the unit dosage form available for use, storing it prior to use, and using it by intravenously administering it to the patient | Construction necessary only because the parties appear to dispute the plain and ordinary meaning, which is that the steps must occur in this order: providing, then storing, then administering |

Baxter's construction of "providing … storing … administering" requires that the steps occur in their written order of providing the vasopressin formulation, then storing it, then administering it. Par agrees that the "administering" step must take place last. (*Supra* at 13). The

[5] Page numbers of the patent file histories refer to PDF page numbers.

only dispute is whether the "providing" step must occur before the "storing" step, as Baxter contends. Baxter's construction is consistent with the plain and ordinary meaning of the claim language and is wholly supported by the specification and file history. In contrast, Par's construction—where "providing" the claimed unit dosage form can occur effectively at any time up to and including administering the drug to the patient—is ambiguous and contradicted by Par's own sworn statements to the Patent Office.

"[A] term's ordinary meaning must be considered in the context of all the intrinsic evidence, including the claims, specification, and prosecution history." *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1094 (Fed. Cir. 2013). The claims are part of "a fully integrated written instrument," and "must be read in view of the specification, of which they are a part." *See Phillips*, 415 F.3d at 1315. A court "should also consider the patent's prosecution history, if it is in evidence." *Markman,* 52 F.3d at 980. "The prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention." *Azurity Pharms., Inc. v. Amneal Pharms.*, LLC, No. 21-08717 (GC), 2022 WL 3691392, at *3 (D.N.J. Aug. 25, 2022) (citing *Phillips*, 415 F.3d at 1317).

Additionally, "[a] process claim is properly limited to a certain order of steps when the claim language, as a matter of logic or grammar, requires that the steps be performed in the order written, or the specification directly or implicitly requires an order of steps." *Amgen*, 923 F.3d at 1028 (quotes omitted); *Loral Fairchild*, 181 F.3d at 1322 ("Although not every process claim is limited to the performance of its steps in the order written, the language of the claim, the specification and the prosecution history support a limiting construction in this case."). As shown below, the claims, specification and prosecution history each lead to the same logical and common

sense conclusion: the "providing," "storing" and "administering" steps must occur in their written order.

**a. The claim language supports Baxter's proposed construction**

The claim language in the '520 and '372 patents confirms that the "providing" step must come first. Claim 1 of the '520 patent is exemplary and states in relevant part:

> A method of increasing blood pressure in a human in need thereof, the method comprising:
>
> a) providing a unit dosage form for intravenous administration, wherein the unit dosage form comprises:
>
> i) from about 0.1 units/mL to about 1 unit/mL of vasopressin or a pharmaceutically-acceptable salt thereof;
>
> ii) from about 1 mM to about 10 mM acetate buffer;
>
> iii) 0-2% vasopressin degradation products;
>
> iv) sodium chloride; and
>
> v) water; and
>
> b) storing the unit dosage form for at least about 24 hours at from about 0.1 units/ml to about 1 unit/ml of vasopressin or a pharmaceutically-acceptable salt thereof; and
>
> c) after the storing, administering the unit dosage form to the human by intravenous administration ….

(D.I. 94, Ex. 1 ('520 patent at claim 1) (emphasis added)).

Here, logic and grammar dictate that a unit dosage form cannot be stored until it has first been provided. *See Chiesi USA Inc. v. MSN Pharms. Inc.*, No. 19-18564, 2021 WL 4843806, at *2 (D.N.J. Oct. 18, 2021) (quoting *Amgen*, 923 F.3d at 1028) ("A process claim is properly limited 'to a certain order of steps' where 'the claim language logically requires that the process steps … be performed in sequence.'").

There is no reasonable dispute that a unit dosage form must be "provided" before it can be "stored" and then "administered." The claim language reflects that logic, explaining to the user the components of the dosage form that will then be stored. The "providing" step provides *a* unit

dosage form that has specific characteristics, while the "storing" step stores *the* previously described unit dosage form. This demonstrates that the "providing" step must take place before the "storing" step. "Subsequent use of the definite articles 'the' or 'said' in a claim refers back to the same term recited earlier in the claim." *Wi-Lan, Inc. v. Apple, Inc.*, 811 F.3d 455, 462 (Fed. Cir. 2016). Courts have used antecedent basis when construing claims as requiring the claimed steps occur in their written order. *E.g., Hytera Commc'ns Co. Ltd. v. Motorola Sols., Inc.*, 841 F. App'x 210, 218 (Fed. Cir. 2021) ("Hytera argues that the antecedent basis is not meaningful because the 'determining' step could have just as easily said 'a' timeslot; on the contrary, the fact that the 'determining' step says 'the' when it could have said 'a' reinforces our conclusion that it is meant to come after the 'preparing' step."); *Techno View IP Inc. v. Oculus VR LLC*, No. 17-386-VAC-CJB, 2018 WL 4141032, at *2-3 (D. Del. Aug. 30, 2018) (finding that the step of "storing an image" must necessarily take place prior to the step of "determining if the image is in [2D or 3D] format" due to antecedent basis).

Additionally, the steps of the '520 patent are labeled with ordinal letters, indicating that they are a series that is intended to be performed in that specific order. *See Intell. Ventures II, LLC v. AT & T Corp.*, Nos. 13-cv-116-LY, 13-cv-118-LY, 13-cv-119-LY, 2015 WL 4138590, at *14-15 (W.D. Tex. July 8, 2015). *In Intell. Ventures II,* the court found that claim steps, which were labeled A, B, and C, must be performed in that order due to antecedent basis "reinforced by the ordinal nature of the patentee's choice in labeling the step." *Id.* at *14. The court found that the patentee's choice to delineate different lines of the claims with spacing and punctuation and others with ordinal letters indicated that the "alphabetic designations do indicate an intended order for the performance of the steps." *Id.* The same is true here.

The Federal Circuit addressed a similar situation in *Mantech*, finding that the step of "providing" wells must take place before the later steps of the claim which *act upon* said wells. *Mantech Env't Corp. v. Hundson Env't Servs., Inc.*, 152 F.3d 1368, 1375-76 (Fed. Cir. 1998). There, the patent comprised four steps which generally consisted of (a) providing wells, (b) injecting acetic acid into said wells to acidify the groundwater, (c) introducing ferrous ion into the groundwater and (d) providing a flow of hydrogen peroxide into the groundwater through one of the wells. *Id.* at 1375-76, 1375 n.13. *Mantech* argued that the steps could occur in any order. The Federal Circuit flat out disagreed finding that:

> Step (a) provides the wells. No monitoring or injecting of the groundwater can occur until wells are provided; hence, step (a) must be performed first. Step (b) introduces acetic acid, via the wells provided in step (a) …. Hence, in order to accomplish step (b), the wells of step (a) must already have been provided.

*Id.* at 1375-76.

Similarly, in *Chiesi*, the district court found that before a solution may be mixed it must first be formed. *Chiesi*, 2021 WL 4843806, at *2. "[A]s a matter of logic, before the first solution may be 'mixed' in step (b), it must first be 'formed' in step (a). The plain language of the Patent provides no alternative method to obtain the first solution." *Id.* As in *Mantech* and *Chiesi*, logic and the plain language of the claim dictate that an object (unit dosage form) must first be available (manufactured) before it can be acted upon (stored). *See also Tuna Processors, Inc. v. Hawaii Int'l Seafood, Inc.*, 327 F. App'x 204, 208-210 (Fed. Cir. 2009) (finding the claim language required the step of producing smoke to take place before the steps of filtering the smoke and cooling the smoke); *Zapmedia Serv., Inc. v. Apple Inc.*, No. 08-104, 2010 WL 2036406, at *14-15 (E.D. Tex. May 19, 2010) (finding that the step of providing a user account must occur before the step of "authorizing … a plurality of media player assets with the user account."); *Zapmedia Serv., Inc. v. Apple, Inc.*, No. 08-104, 2010 WL 8599970, at *12-13 (E.D. Tex. Aug. 19, 2010) (overruling

objections to the May 19 order finding that the step of providing a user account must occur before the step of "authorizing … a plurality of media player assets with the user account.").

Par cites to the claim language of "after the storing, administering" the unit dosage form as evidence that "when the inventors wanted to dictate that the steps of the claim 'must occur' in a particular order, they knew how to do so." (*Supra* at 13-14). The inclusion of the word "after" in that clause is entirely superfluous. Par agrees that the "administering" step necessarily takes place last, and not because the claim says administration must occur "after" storage. It is logically impossible to store the drug after it has been administered to a patient. Par thus acknowledges that logic can dictate a claimed method be performed in a specific order even if the claim language is silent on the order of the claims, and Par has no basis for denying the logic that a unit dosage form must be provided before it can be stored.

Par's construction is also improper because it focuses on how the unit dosage form is transported/moves throughout the hospital. That ignores the claim language and purpose of the patents. The claimed invention is directed to "ready-to-use vasopressin formulations having enhanced stability characteristics, which enable ready-to-use vasopressin formulations to be stored for up to 24 months." (*Supra* at 2). As such, a skilled person would understand that "providing," in the context of the claims, refers to making the claimed unit dosage form having "enhanced stability characteristics" available, and not to the distribution of the unit dosage form within a hospital system.

**b. The specification supports Baxter's proposed construction**

The patents' specification further supports Baxter's construction. It contains a list of embodiments of the claimed invention, 110 of which include the step of "providing." ('520 patent at 16:4 – 48:35). In each of these embodiments the "providing" step is listed prior to the "storing"

step because one cannot store something that has not been provided. This overwhelming amount of intrinsic evidence directly supports Baxter's proposed construction.

Moreover, in 74 of these examples, the claimed method follows the general steps of "a) providing" a unit dosage form comprising vasopressin, "b) storing" the unit dosage form for a specific length of time in specific conditions, "c) diluting" the unit dosage form to a specific vasopressin concentration, and "d) administering" the diluted unit dosage form to a patient, wherein the unit dosage form exhibits specific degradation characteristics after the "storing" step. (*Id.* at 16:4 – 39:24). Unsurprisingly, this method is entirely consistent with how the prior art concentrated vasopressin products are used. (*Id.* at 67:20-32; Freudiger Decl. at ¶ 39; *supra* at 2). The product was first provided at a concentration appropriate for storage, then stored, then diluted to an administration concentration, and then administered. Nowhere does the specification discuss storing, diluting and only *then* providing the product. A skilled person would readily and easily understand that these examples refer to the concentrated products and, therefore, the "providing" steps in those examples refer to the initial concentrated unit dosage form.

The other 36 embodiments contain the general steps of "a) providing" a pharmaceutical composition, "b) storing" the pharmaceutical composition for a specific length of time in specific conditions, and "c) intravenously administering" the pharmaceutical composition to a patient, wherein the unit dosage form exhibits specific degradation characteristics after the "storing" step. (*Id.* at 39:25 – 48:35). Plaintiffs have previously argued that these "embodiments would cover administration of the vasopressin both in concentrated form (such as via an IV push), or in diluted form (such as via an IV drip)." *See Par Pharm., Inc. v. Eagle Pharms., Inc.*, No. 18-cv-823-CFC-JLH, D.I. 63 at 58-59 n.27 (D. Del. May 11, 2019) (Joint Claim Construction Brief). In either case, there is a unit dosage form provided before any unit dosage form is stored.

These 110 examples are important because when construing method claims to require a specific order as Baxter suggests, courts rely on the *lack* of an embodiment showing the steps performed in a differing order. *Hytera*, 841 F. App'x at 219 (holding that language of the claim, supported by the embodiments in the specification, supported construing the claims as requiring the steps be performed in the order written because "here, the only embodiments are consistent with the plain meaning of the claim in the order that is written, and we thus decline to construe the claim as allowing deviation from that order."); *Wi-Lan*, 811 F.3d at 462 (finding that the specification supported an ordering requirement in the claims when "[n]o disclosure in the specification depicts or discusses the possibility" of carrying the steps out in an order other than as written in the claim).

Further, the patent specification focuses on the stability and shelf life of the claimed formulations and not the distribution of pharmaceuticals. (*See* '520 patent at 48:36-65, 52:42-62). This is because the patents are directed to stable vasopressin formulations not the transportation of pharmaceuticals. (*See supra* at 1-2; Section III.A.2.a). As such, Par's attempt to shift the focus of the patent from the stability of the claimed unit dosage form to their transportation is contradicted by the patent specification.

#### c. The prosecution history supports Baxter's proposed construction

The patents' prosecution history also supports Baxter's construction. To avoid their own prior art and obtain allowance, Par was forced to make a classic narrowing amendment of the claims of the '520 patent, as well as several other co-pending related applications, to require the claimed unit dosage form be stored for at least about 24 hours "*after*" it had been provided. (D.I. 94, Ex. 9 ('520 FH at 10).) For the reasons discussed below, Par's blatant attempt to now ignore their own narrowing amendment and statements to the Examiner should not and cannot be

permitted. Instead, consistent with the rudimentary tenets of claim construction, the patent has to be limited to what was claimed and allowed: namely, where the "providing," "storing," and "administering" steps take place in that order. *Traxcell Techs., LLC v. Nokia Sols. & Networks Oy*, 15 F.4th 1136, 1141 (Fed. Cir. 2021) ("The doctrine 'ensures that claims are not construed one way in order to obtain their allowance and in a different way against accused infringers.'").

**i. Par Added the Step of Storing After Providing to Obtain Allowance**

During prosecution of the '520 patent, Par sought allowance of a claim that had only "providing" and "administering" steps, with no storage step. ('520 patent FH at 3). The Examiner rejected that claim as obvious over the prior art because it covered prior art embodiments in which the unit dosage form was administered without a storage step. (*Id.* at 10). In response *Par* itself "suggested adding a step of *storing* the vasopressin for at least about 24 hours *after providing the unit dosage form and before administering*." (*Id.*) (emphasis added). The Examiner accepted this proposed amendment, stating that it "would overcome the rejection because the Vasostrict Label clearly teaches away from storing for more than 24 hours." (*Id.*). The Examiner then allowed the amended claim which issued as claim 1 of the '520 patent. In the Reasons for Allowance the Examiner stated that "Diluting the vasopressin … *and storing* the vasopressin in diluted form for at least about 24 hours prior to administration is not obvious over" the prior art. (*Id.* at 18) (emphasis added).

In short, the Examiner granted allowance based on the amendment *suggested by Par* of *"adding a step of storing* the vasopressin for at least about 24 hours *after providing the unit dosage form and before administering*." (*Id.* at 10) (emphasis added). Here, the patentee's own words clearly demonstrate that the claimed steps must occur in their listed order of providing, then storing, then administering. A patent's prosecution history "captures the public record of the

patentee's representations concerning the scope and meaning of the claims" and "provides evidence of how the [PTO] and the inventor understood the patent." *Biogen*, 713 F.3d at 1095.

In light of this narrowing of the claims to require that the unit dosage form be stored for at least about 24 hours *after* it has been provided in order to obtain allowance, Par's construction is a stark example of an improper attempt to recapture what was unequivocally disclaimed during prosecution in order to obtain allowance. For this additional reason, Par's attempt to ignore their own narrowing amendment flies in the face of basic rules of claim construction and Federal Circuit precedent. As such, it must be rejected. The prosecution history of the patent "limits the interpretation of the claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance." *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985).

**ii. The Examiner Understood that Storing Follows the "Providing" Step**

The Examiner's Notice of Allowance further demonstrates that the "providing" step necessarily takes place before the "storing" step. The Examiner provided two reasons for allowance both of which demonstrate that the claimed "providing" step precedes the claimed "storing" step.

The first reason for allowance was that the prior art "Vasostrict Label teaches away from the step of storing the diluted form for at least 24 hours because it states that the vasopressin must be discarded 18 hours after dilution if kept at room temperature or 24 hours if refrigerated." ('520 patent FH at 18). The second was because:

> [T]he instant specification reports that the claimed unit dosage form has an estimated shelf life at 5 C of about 16.1 months and at 225 C of about 8 months [referring to Formulations C, D, G, H in Example 17]. This level of stability is unexpected given that the Vasostrict® Label states that the vasopressin must be discarded 18 hours after dilution if kept at room temperature or 24 hours if refrigerated (§2).

(*Id.*).

In both circumstances, the Examiner refers to the time period between when the vasopressin formulation is first made available at its administration concentration, either through dilution (as in the prior art Vasostrict Product) or manufacture (as in the patent examples, Baxter's Product and Par's Vasostrict® Product), and when the vasopressin formulation must be discarded as "storing."

This further demonstrates that the Examiner considered the first time that the claimed unit dosage form is made available as the "providing" step. The Examiner required an amendment to "remove embodiments of the claim wherein the unit dosage form is diluted just prior to administration" as was the case for Par's prior art Vasostrict® Product. (*Id.* at 10). The amendment suggested by Par of "*storing* the vasopressin for at least about 24 hours *after providing* … and *before administering*" overcame the rejection because the prior art Vasostrict® Product had a shelf life of 18 hours at room temperature or 24 hours refrigerated once diluted to its administration concentration. (*Id.*). The prior art Vasostrict® Product could be stored for longer than 24 hours prior when concentrated, but once *provided, i.e.*, diluted to a vasopressin concentration of about 0.1 units/mL to about 1 unit/mL, it had a shelf life of 18 hours at room temperature, or 24 hours refrigerated.

Similarly, the data the Examiner cited as support for the purported unexpected level of stability show the stability of the example formulations starting from their *time of manufacture*. (*Id.* at 18, '520 patent at 67:31-32, 116:1-30, 116:55-117:12, 117:26-45, 161:63-66, 162:45-47, Figure 27, Figure 28). This further demonstrates that the Examiner granted the '520 patent based on the shelf life of the administrable vasopressin unit dosage form (*i.e.*, starting at the time of its manufacture in a form that could be administered to patients), and not based on the tracking of the

amount of time the vasopressin unit dosage form is sitting in one particular location (such as the manufacturer's warehouse prior to shipping or in a hospital pharmacy or automated dispensing cabinet ("ADC")). (*See* Freudiger Decl. at ¶ 35).

Par's construction actually requires one to conclude that the issuance of the '520 patent was somehow based on how the unit dosage form is transported/moves throughout the hospital. However, as discussed above, that concept finds no support anywhere in the claims and specification, which do not suggest in any way that the manner in which the claimed formulation is moved from one area of a hospital to another has anything to do with the invention. The prosecution history is no different. Both Par and the Examiner focused on the stability of the claimed unit dosage form and not the manner in which it moves from one floor of a hospital building to another.

**iii. Par Made the Same Amendment in Related Patents to Obtain Allowance**

The prosecution histories of the related '006, '422, '649 and '575 patents further buttress Baxter's proposed construction. The '520, '006, '422, '649 and '575 patents are all continuations of the '649 application, while the '372 patent also descends from it. Claim terms in patents that derive from the same parent application and share many common terms must be interpreted consistently. *NTP, Inc. v. Rsch. In Motion, Ltd.*, 418 F.3d 1282, 1293 (Fed. Cir. 2005); *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1350 (Fed. Cir. 2004). The relevant portions of the prosecution history of each of these patents resembles that of the '520 patent.

During the prosecution of each of these applications the Examiner required an amendment to remove embodiments of the claim wherein the unit dosage form is diluted just prior to administration to overcome obviousness rejections over Par's prior art Vasostrict® Product. (D.I. 94, Ex. 10 ('006 patent FH at 10); D.I. 94, Ex. 11 ('422 patent FH at 10); D.I. 94, Ex. 12 ('649

patent FH at 10); D.I. 94, Ex. 13 ('575 patent FH at 10).) In response, Par suggested the *same narrowing amendment* of "adding a step of *storing* the vasopressin for at least about 24 hours *after providing* the unit dosage form and before administering." (*Id.*) However, unlike in the '520 patent, none of the then-pending claims of the '006, '422, '649 and '575 patents contained a "providing" step. ('006 patent FH at 3, '422 patent FH at 3, '649 patent FH at 3, '575 patent FH at 3.) Thus, the applicants' suggested amendment entailed adding *both* the "providing" and the "storing" steps to implement Par's own suggestion that the dosage form should be stored *after* it is provided, as shown in relevant part in the representative claim below:

> A method of increasing blood pressure in a human in need thereof,
>
> the method comprising:
>
> *providing* a pharmaceutical composition …
>
> *storing the unit dosage form for at least about 24 hours* …
>
> *after the storing, intravenously administering the unit dosage form* …

('006 patent FH at 18-19 (emphasis added); *see also* '422 patent FH at 17-18, '649 patent FH at 17-18, '575 patent FH at 17-18). These amendments further demonstrate that the "providing" step necessarily takes place *before* the "storing" step. Hence, Par's proposed amendment of "adding a step of storing the vasopressin for at least about 24 hours after providing the unit dosage form and before administering" refers to the order of the claimed steps, and not simply the location of the language within the claim.

This situation is analogous to that in *Fraser v., High Liner Foods, Inc.*, No. 06-11644-RWZ, 2008 WL 8920211 (D. Mass. July 10, 2008). The patent claim at issue contained elements where a fish is:

> (1) filleted to "appropriate thickness," then (2) "immediately" immersed in "a vegetable oil" (3) "for a period of 5 to 10 minutes" (4) "at room temperature," followed by (5) "draining the excess oil from the surface," (6) "covering the surface with crumbs," and (7) "then freezing the fillet."

*Id.* at *3. During prosecution, the patentees distinguished the claimed invention from prior art by pointing to the step of immersing the fillet in oil for 5-10 minutes to achieve penetration of oil into the filet. *Id.* at *4. As a result of the patentees' arguments before the examiner during prosecution as well as the language of the allowed claim, the court found that each step needed to be performed in the recited order. *Id.* The Federal Circuit agreed, finding that "the prosecution history of the '930 patent requires respecting the order of the claimed steps." *Fraser v. High Liner Foods (USA), Inc.*, 337 F. App'x 883, 888 (Fed. Cir. 2009). "Appellants obtained allowance of their claim only after distinguishing the prior art based on the claimed step of immersing the fillet in oil for a period of five to ten minutes *immediately following* filleting." *Id.* Akin to this precedent, the patentees here were only able to obtain allowance of the '520, '006, '422, '649 and '575 patents by distinguishing the claimed invention as being able to be stored for at least about 24 hours "after providing the unit dosage form and before administering." (*See e.g.*, '520 patent FH at 10; *see also supra*).

**d. Plaintiffs' proposed construction provides no clarity**

Plaintiffs' proposed construction ignores the claim language, patent specification, prosecution history and logic, in several ways. First, Par argues that a manufacturer "provides" the claimed unit dosage form to a shipper or distributor, the shipper or distributor "provides" it to hospitals, and hospitals then "provide" it to clinicians for administration through a variety of different methods. (*Supra* at 9-10, 12-13; Coralic Decl. at ¶¶ 26-28). Par appears to further argue that the claimed "storing" step is any time period before providing the unit dosage form, between "providing" steps, or after providing but before administering the unit dosage form, as long as that

time period is at least about 24 hours. (*Id.*). As discussed above, Par's proposals for the providing and "storing" steps are contradicted by the intrinsic evidence in the patent and should be rejected. (*See* Sections III.A.2.a-c).

Second, Par's proposals for the claimed "providing" and "storing" steps are internally inconsistent. Par conflates the physical movement of products between different entities following their manufacture (*i.e.*, from the manufacturer to a distributor and then from the distributor to the hospital), with the intra-hospital movement of pharmaceuticals prior to their use (*i.e.*, a drug product being moved from one location in the hospital to another or from one location in a hospital to a clinician for use). Par thus ignores both the purpose of the patents and logic. The parties agree that drug products are moved throughout hospitals prior to their administration. (*See supra* at 9-10, 12-13; Coralic Decl. at ¶¶ 26-28; Freudiger Decl. at ¶¶ 13-15). However, if moving a drug product to a different location within a hospital, or placing it in the possession of a different individual within the same hospital, satisfies the "providing" step as Par claims,[6] then surely doing the same thing at a pharmaceutical manufacturer or distributor must also satisfy the claimed "providing" step. And if that is the case, then logically the "providing" step must still take place first.

Par also argues that "logically, after vasopressin products are first made they will be stored by the manufacturer for some period of time before they are ever provided to the shipper/distributor." (*Supra* at 12). However, Par ignores the fact that pharmaceuticals are not simply left in place following their manufacture. Instead, finished drug products are moved from their place of manufacture to another location, such as a warehouse, for storage and shipment. Following Par's logic, this movement—which takes place before a drug product is "stored" for at

---

[6] It does not for the reasons explained herein.

least about 24 hours—would be a "providing" step. Thus, even according to Par's overly broad position regarding the "providing" step, it still takes place before the "storing" step.

Additionally, Par's proposed construction is ambiguous and confusing, and does not help resolve issues of infringement. Par's proposal allows any number of actions to constitute the claimed "providing" step, and any time periods between them (as long as they are at least about 24 hours) to satisfy the claimed "storing" step. This introduces significant uncertainty into the infringement analysis to the point that an alleged infringer would not know whether he or she infringes. Allowing for a construction that will insert uncertainty into the infringement analysis undercuts the very purpose of claim construction. *See In re Papst Licensing Digit. Camera Pat. Litig.*, 778 F.3d 1255, 1261 (Fed. Cir. 2015) ("[I]t is worth reiterating that a district court may (and sometimes must) revisit, alter, or supplement its claim constructions … to ensure that final constructions serve *their purpose of genuinely clarifying the scope of claims* for the finder of fact.") (emphasis added); *see also Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1383 (Fed. Cir. 2011) ("[T]he purpose of 'claim construction' is to resolve issues of infringement.").

Under Par's proposed construction, for instance, after having been manufactured, the unit dosage form may be "stored" multiple times before it is administered to the patient including at the manufacturer, distributor, hospital pharmacy and/or ADC. But the claims require "storing the unit dosage form for at least about 24 hours." As such, Par's proposal precludes infringement where no single "storing" step exceeds 24 hours. So even if the total time from the creation of a unit dosage form to its administration is well in excess of 24 hours—if no single "storing" step exceeds 24 hours, there is no infringement. For example, if a unit dosage form is manufactured and then administered one month later, under Par's proposed construction infringement could be

avoided simply by implementing a workflow with multiple "providing" and "storing" steps to ensure that the unit dosage form is never stored at one time for more than 24 hours.

Thus, determining infringement under Par's proposal requires tracking all movement of the unit dosage form across various different entities from the date it is created until it is administered to a patient. Under Baxter's proposal, which is consistent with the intrinsic evidence, the unit dosage form is "provided" when it is first made available at the claimed concentration, and is "stored" from that time until its administration. In this scenario, whether a "providing" step is performed merely requires analysis of the date the unit dosage form was manufactured. (Freudiger Decl. at ¶¶ 16, 35). This interpretation is consistent with the claimed invention, which is ready-to-use vasopressin compositions with enhanced stability characteristics that can be stored for extended periods of time. (*See* Coralic Decl. at ¶ 12; '520 patent FH; Sections III.A.2.a-c).

**e. The Cases Par Cites are Distinguishable**

The cases cited by Plaintiffs are readily distinguishable from the current case. In *Interactive Gift*, the claims covered a method of manufacturing and selling material objects at multiple locations. 256 F.3d at 1327-28. The Federal Circuit found that the claimed steps of providing information and requesting information could occur in any order, "[l]ogically, information could be sent after a request is made." *Id.* at 1343. Here, unlike in *Interactive Gift*, the claimed steps cannot occur in any order because a unit dosage form cannot be stored until it is "provided." Further, in *Interactive Gift*, the patent specification described two embodiments where the "providing" information step was performed after the "requesting" information step. *Id.* at 1343. Here, the specification discloses 110 embodiments where the "providing" step comes *prior* to storing and none where it does not, making it clear that the unit dosage form must be provided *before* it can be stored.

In *Nippon*, the claims covered a method of chemically synthesizing an oligomer. 2023 WL 4314485. The Court found that a skilled person would understand that the order of steps was "not relevant to the claimed method" because they could be performed in any order to successfully obtain the desired product. *Id.* at *16. Unlike the chemical synthesis in *Nippon*, order is *relevant* to the methods before this Court. It impossible to store a unit dosage form before it is provided. Unlike in *Nippon*, where additional unrecited steps allowed the claimed steps to occur in any order, no number of additional unrecited steps could allow a unit dosage form to be stored before it has been made first available. Additionally, adding the step of storing the unit dosage form after providing it was why Par was able to convince the examiner to allow the claims by adding the "storage" limitation. (*See* Section III.A.2.c).

Further, in contrast to *Nippon*, the requirement that the "providing" step take place before the "storing" step is unmistakably demonstrated by the intrinsic record. (*See* Sections III.A.2.a-c). Here, the use of "comprising" does not change the requirement that the claimed steps take place in the order providing, storing, and administering, as dictated by the intrinsic evidence. Courts have found that method claims which use "comprising" must still take place in their written order in light of intrinsic evidence. *See, e.g., Kaneka Corp. v. Xiamen Kingdomway Grp. Co.*, 790 F.3d 1298, 1306 (Fed. Cir. 2015); *E-Pass Techs., Inc. v. 3Com Corp.*, 473 F.3d 1213, 1222 (Fed. Cir. 2007); *Mantech*, 152 F.3d at 1376; *Bio-Rad Lab'ys, Inc. v. 10X Genomics, Inc.*, 496 F. Supp. 3d 563, 574 (D. Mass. 2020).

In *Altiris*, the patent at issue was drawn to a method of allowing remote access to a computer network. 318 F.3d 1363. The Federal Circuit found that there was nothing in the claim language or specification which required the claims to be carried out in a specified order. *Id.* at 1370-71. Further, expert witnesses for both parties testified that it was technically feasible to

accomplish the claimed method by performing the steps in an order other than the one in the claims. *Id.* For these reasons, the Federal Circuit construed the claims as allowing the steps to occur at any time. Here, as discussed above, the claim language and patent specification require the claims be carried out in a specified order. Further, unlike the circumstances in *Altiris*, it is not possible to perform the claimed steps in a different order since something cannot be stored until it has first been provided.

**f. Because the intrinsic evidence is clear there is no reason to consider the extrinsic expert declaration**

The intrinsic evidence discussed above demonstrates that the claimed "providing," "storing" and "administering" steps must take place in that order. Therefore, there is no reason for the court to rely on the Coralic Declaration. When "analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term …. it is improper to rely on extrinsic evidence." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996); *see also Azurity Pharms.*, 2022 WL 3691392, at *14 (finding that the meaning of a claim term was clear based on the claim language and patent specification and therefore not considering an expert declaration).

Additionally, the Coralic Declaration is at odds with the claim language, specification and prosecution history of the Patents-in-Suit, which all require that the claimed steps take place in the order "providing," "storing," "administering." For this additional reason, the Court should disregard the Coralic Declaration. *Phillips*, 415 F.3d at 1318.

**g. A skilled person would understand that the claims require the order proposed by Baxter**

To the extent the Court relies on the testimony of experts to construe these claims, Baxter's expert Michael Freudiger explains that a skilled person would understand the claims to require the order proposed by Baxter. According to Dr. Freudiger, a skilled person reviewing the patent claims, specification and prosecution histories—*i.e.*, a skilled person trying to interpret the claims

in light of the intrinsic evidence—would understand that the "providing" step refers to when the claimed vasopressin unit dosage form is first made available in the claimed concentration, such as when it is manufactured by a pharmaceutical company or compounded in a hospital pharmacy. (Freudiger Decl. at ¶¶ 31, 35, 39, 42-43, 45). Additionally, a skilled person would consider the claimed "storing" step to be the time period between providing and administering the unit dosage form. (*Id.* at ¶¶ 36, 40). As Dr. Freudiger explains, this is consistent with how a drug product's shelf life is measured. (*Id.* at ¶¶ 16, 36).

A skilled person would understand that the storing time must be shorter than the shelf life to avoid wasting medicines. (Freudiger Decl. at ¶ 36; *see also supra* at 2 (stating that Par's RTU vasopressin products have "enhanced stability characteristics, which enable ready-to-use vasopressin formulations to be stored for up to 24 months.")). Further, drug products are always marked with their expiration date and a skilled person is readily able to ascertain a drug products' date of manufacture (*i.e.*, when the drug product is "provided") based on the shelf life of the drug product. (Freudiger Decl. at ¶ 16).

Conversely, the declaration of Dr. Coralic does nothing to assist the court in understanding how a skilled person would understand the claimed steps in light of the intrinsic evidence. Both experts generally agree on the various routes of intra-hospital movement of pharmaceuticals. (Coralic Decl. at ¶¶ 15-18; Freudiger Decl. at ¶¶ 13-15). However, while Dr. Freudiger examined the intrinsic evidence to determine how a skilled person would understand the claims and their use of the word "providing," Dr. Coralic makes no mention of the intrinsic evidence besides saying that he reviewed the intrinsic evidence cited by the parties. (Coralic Decl. at ¶¶ 24-25). Instead, Dr. Coralic takes the position that there can be any number of "providing" and "storing" steps corresponding to various routes for the intra-hospital movement of pharmaceuticals. (Coralic Decl.

at ¶¶ 26-28). However, this position is unsupported by intrinsic evidence and contrary to how a skilled person would understand the claims. (*See* Sections III.A.2.a-c; Freudiger Decl. at ¶¶ 43-45). As such, it should not be considered. *Phillips*, 415 F.3d at 1318.

**3. Plaintiffs' Reply Position**

Baxter seeks to go beyond the ordinary meaning of the claimed "providing," "storing," and "administering" and tacks on a non-ordinary requirement—that these actions "must occur in their written order." *Supra* at 16-18, 32-33. Nothing in the language of the claims themselves, the patent specifications, or their prosecution histories compels deviating from the plain and ordinary meanings of these claim terms. *See, e.g., Aventis Pharms.*, 715 F.3d at 1373.

**a. Baxter has not shown that the claim language or the specifications support its proposed construction**

Baxter first asserts that the Court should adopt its proposed construction because it is "consistent with the plain and ordinary meaning of the claim language"—*i.e.*, because it comports with the order in which the actions are recited by the claims. *Supra* at 17-20. But that assertion fails to apply the presumption *against* requiring a claimed method to be performed in any particular order (*see, e.g.*, *Interactive Gift*, 256 F.3d at 1342-1344) or the Federal Circuit's two-part test for determining when that presumption has been overcome (*see, e.g., Altiris*, 318 F.3d at 1369).

Baxter's argument hinges on its assertion that "logic and grammar dictate that a unit dosage form cannot be stored until it has first been provided." *Supra* at 17-20. However, this argument is based on Baxter's narrow view of "providing" as being synonymous with "manufacturing" of the unit dosage form (*supra* at 28-31); whereas in reality, "providing" can occur numerous times from the time of manufacture up to "administering" to a patient. Indeed, as Dr. Coralic discusses in detail, vasopressin products are stored by a hospital or pharmacist before he or she then provides them (makes them available / furnishes them / supplies them) to a clinician for administration to

patients. *See, e.g.*, Coralic Decl.[7] at ¶¶ 14-18, 25-28; Coralic Reply Decl.[8] at ¶¶ 4, 7-10, 12, 17-19.

The cases Baxter cites in support of its arguments are inapposite and distinguishable. For example, in *Amgen* the claim at issue recited a method of purifying a protein via multiple steps, including "washing the separation matrix" and "eluting the protein from the separation matrix." 923 F.3d 1023, 1026 (Fed. Cir. 2019). The Federal Circuit construed the claim as requiring "washing" to precede "eluting" because the specification made clear that the protein of interest was to be eluted only after the separation matrix had been washed. *Id.* Here, the specifications of the '520 and '372 patents say nothing to require or suggest that "providing" *must always* precede "storing."

Similarly, in *Chiesi*, the patent claims specifically required "dissolving cangrelor or a salt thereof in a solvent *to form a first solution*" and another step of "mixing a pH-adjusting agent with *the first solution* to form *a second solution*." 2021 WL 4843806, at *2 (emphasis added). As recited, the first solution must be made and then mixed with another substance in order to form the second solution, such that the "first solution" necessarily had to be formed before the claimed "second solution" could be. *Id.* at *11. Accordingly, Plaintiffs do not dispute that the two steps in *Chiesi* had to occur in order. *Id.* However, no such language or logic compels that result with respect to the "providing" and "storing" required by the asserted claims of the '520 and '372 patents.

Further, where logic dictated, the patentees did, in fact, expressly recite that certain parts of the claimed methods must occur in a particular order. For example, claim 1 of the '520 and '372

---

[7] Reference to "Coralic Decl." herein refers to the Declaration of Zlatan Coralic, Pharm. D., BCPS, FASHP, dated May 9, 2024.

[8] Reference to "Reply Coralic Decl." herein refers to the Reply Declaration of Zlatan Coralic, Pharm. D., BCPS, FASHP, dated June 26, 2024

patents requires that "intravenous administration" is "*after* the storing." D.I. 94, Ex. 1, claim 1 (emphasis added); D.I. 94, Ex. 3, claim 1 (emphasis added). Recognizing that this claim language is fatal to its construction, Baxter argues that "[t]he inclusion of the word 'after' in that clause is entirely superfluous." *Supra* at 20. Not so. The patentees specifically included this language in an amendment to overcome the prior art, and thus the inclusion of the word "after" was not "superfluous." (*See, e.g.*, D.I. 94, Ex. 9 at 17-18[9].) Moreover, this supports Plaintiffs' argument that "when the inventors wanted to dictate that the steps of the claim 'must occur' in a particular order, they knew how to do so." (*Supra* at 14-15.) And the inventors included no such language that requires the "providing" and "storing" to be performed in any particular order.

*Hytera* is also inapplicable to the facts at hand. 841 F. App'x 210. In *Hytera*, the claim recited a five-step method of improving a wireless communication system, and Hytera conceded that some of the steps had to occur in order, only challenging that the claimed "preparing" step had to come before the claimed "determining" step. 841 F. App'x at 218. However, in all of the embodiments in the specification, the preparing step was performed prior to the determining step, and the Court found it incongruous that four of five of the steps would have to be performed in order, but one could be performed out of order. *Id.* at 218-19.

Here, in contrast, nothing in the specification requires that the "providing" and "storing" be performed in only one particular order. Baxter cites 32 columns of the '520 patent, encompassing 110 embodiments, to suggest that the specification describes "providing" as occurring before "storing" step, but the cited columns merely recite potential embodiments using

[9] Page numbers of the patent file histories refer to PDF page numbers.

the same structure and verbiage as the claims of the ’520 patent.[10] *Supra* at 20-22. Nothing in those passages requires by logic or language that the “providing” *must always* occur before the “storing”. Further, the testimony of Dr. Coralic makes clear that, in practice, those steps can and do occur at multiple different times in multiple different orders as vasopressin products proceed from manufacture to eventual administration to patients. Coralic Decl. at ¶¶ 14-18, 25-28; Coralic Reply Decl. at ¶¶ 4, 7-10, 12, 17-19. Indeed, in *Altiris*, the Federal Circuit reversed a determination that the claimed “setting” step had to occur before the “booting normally” step even though they did occur in that order in the lone preferred embodiment because the was no “statement that this order is important, any disclaimer of any other order of steps, or any prosecution history indicating a surrender of any other order of steps.” 318 F.3d at 1371. None of those things are present here either. Quite simply, Baxter seeks to preclude any of the instances in which pharmacists make vasopressin products available to clinicians from “providing” a unit dosage form in accordance with Par’s patents, but there is no basis to do so.

Baxter also overreads *Hytera* as purportedly creating a rule that using “the” in one method step to refer back to some element of another method step that is recited earlier in the claim means that, as a matter of logic and grammar, the earlier recited step must be performed before the later-recited step. *Supra* at 17-18, 22. *Hytera* does not say that, nor do any of the other cases Baxter relies upon.[11] In *Altiris*, for example, the claim recited a method for controlling the boot process

---

[10] The Patents-in-Suit are all from the same patent family and share a common specification. For ease of reference, Plaintiffs cite to the disclosures as found in the ’520 patent. The same disclosures can be found in each of the other Patents-in-Suit.

[11] While the court in *Hytera* did cite that the “preparing” step’s reference to “a timeslot” provided antecedent basis for “the timeslot” referred to in the “determining” step, that was but one factor among others for affirming the lower tribunal’s finding that the steps had to be performed in the recited order.

of a computer, including "testing automatically … ***a*** boot selection flag" and "setting ***said*** boot selection flag," which the district court held had to occur in the recited order. 318 F.3d at 1367-68 (emphasis added). The Federal Circuit reversed, concluding that nothing "grammatically nor logically indicates that the 'setting' step must occur in a particular order compared to the other steps," even though the "testing" step referenced "***a***" boot section flag that the "setting" step referred back to as the "***said***" boot selection flag. *Id.* at 1370. Thus, the fact that the asserted claims of the '520 and '372 patents refer to "a" unit dosage form in the providing step and "the" unit dosage form in the storage step, does not compel a construction that the steps occur in that order.[12]

Indeed, Baxter's argument would effectively eviscerate the presumption against method steps having to occur in a particular order, as set forth in *Interactive Gift,* 256 F.3d 1342-1344 and other cases, because different steps in a method claim will almost always refer to common elements—and almost always do so by referring to "a" component in the first instance, and "the" component in later instances. That is all that is happening in Par's patent claims—the "providing" and "storing" steps refer to the same "unit dosage form" (*e.g.*, the same ready-to-use bag or bottle of vasopressin) that is to be both "provided" and "stored." The patentees thus recited "a" unit dosage form in the earlier-recited step ("providing") and "the" unit dosage form in the later-recited step ("storing"). Nothing about doing so indicates that the two steps have to occur in a particular order, it merely indicates that it is the same bag or bottle of vasopressin that must be both provided and stored.

*Intell. Ventures II, LLC v. AT&T Corp.* is likewise inapplicable. 2015 WL 4138590 *14. In *Intell. Ventures II,* the Court found that "[i]n view of the antecedent basis issue … a plain reading of the claims is that the order of performance is limited [which] is reinforced by the by the ordinal

[12] For similar reasons, *Techno View IP*, 2018 WL 4141032, at *2-3 is not applicable.

nature of the patentee's choice in labeling the steps [and that] the patentee did not choose to delineate all breaks in the claims with ordinal letters." *Id*. Contrary to Baxter's assertion, *see supra* at 18, the same rationale does not apply here. As an initial matter, claim 1 of the '372 patent does not use ordinal letters, therefore *Intell. Ventures II* is not applicable to the '372 patent. Further, unlike the claims in *Intell. Ventures II,* claim 1 of the '520 patent does not just use ordinal letters it also uses ordinal romanettes to identify the properties of the unit dosage form:

> **1**. A method of increasing blood pressure in a human in need thereof, the method comprising:
> a) providing a unit dosage form for intravenous administration, wherein the unit dosage form comprises:
> i) from about 0.1 units/mL to about 1 unit/mL of vasopressin or a pharmaceutically-acceptable salt thereof;
> ii) from about 1 mM to about 10 mM acetate buffer;
> iii) 0-2% vasopressin degradation products;
> iv) sodium chloride; and
> v) water; and
> b) storing the unit dosage form for at least about 24 hours at from about 0.1 units/ml to about 1 unit/ml of vasopressin or a pharmaceutically-acceptable salt thereof; and
> c) after the storing, administering the unit dosage form to the human by intravenous administration, wherein the unit dosage form that is administered to the human comprises from about 0.1 units/mL to about 1 unit/mL of vasopressin or the pharmaceutically-acceptable salt thereof; wherein:
> the unit dosage form has a pH of 3.4 to 3.8; the administration provides to the human from about 0.01 units of vasopressin or the pharmaceutically-acceptable salt thereof per minute to about 0.1 units of vasopressin or the pharmaceutically-acceptable salt thereof per minute; and the human is hypotensive.

(D.I. 94, Ex. 9, claim 1.) This indicates that the patentees were separating the action steps related to the unit dosage form (i.e., "a) providing," "b) storing," and "c) after the storing, administering") from the properties of the unit dosage form (i.e., "i) from about 0.1 units/mL to about 1 unit/mL … ii) from about 1 mM to about 10 mM acetate buffer; iii) 0-2% vasopressin degradation products; iv) sodium chloride; and v) water."). In other words, the ordinal letters do not indicate an intended *order* for performance of the required actions, they simply separate those actions from the characteristics of the unit dosage form. Coralic Reply Decl., ¶¶15-16. This is supported by the

file history of the ’520 patent. During prosecution of the ’520 patent, claim 1 originally recited only “providing” and “administering”, and “storing” was not required. (*See e.g.*, D.I. 94, Ex. 9 at 3.) Notably, claim 1 as originally recited included ordinal letter “a)” for the providing step and ordinal letter “b)” for the administering step, despite the fact that the administering step *necessarily* occurs after the providing step. Thus, it is clear from the early versions of the claims that the ordinal letters of claim 1 were not included to require any specific “order.”

*Mantech* is also inapposite. 152 F.3d at 1375-76. In *Mantech*, the claim at issue required: (a) providing wells; (b) providing acetic acid *from the wells* into ground water; (c) introducing ferrous ion into said ground water; and (d) providing hydrogen peroxide from said wells into said ground water region.” The Federal Circuit found *inter alia* that:

> Step (a) provides the wells. No monitoring or injecting of the groundwater can occur until wells are provided; hence, step (a) must be performed first. Step (b) introduces acetic acid, via the wells provided in step (a) … . Hence, in order to accomplish step (b), the wells of step (a) must already have been provided.

*Id.* at 1375-1376. Accordingly, the Court upheld the district court’s construction that the process must be performed sequentially because, as a matter of pure logic, the steps had to occur in order. *Id.* at 1376. No such language or logic compels that result with respect to the “providing” and “storing” required by the asserted claims. Further, nothing in the specification ascribes any order to the claimed “providing” and “storing”, and the testimony of Dr. Coralic makes clear that in practice, those activities can and do occur at multiple different times in multiple different orders as vasopressin products proceed on the pathway from manufacture to eventual administration to patients, Coralic Decl. at ¶¶ 14-18, 25-28; Coralic Reply Decl. at ¶¶ 4, 7-10, 12, 17-19.

The remaining cases Baxter relies upon—i.e., *Tuna Processors*, 327 F. App’x at 208-210, *Zapmedia*, 2010 WL 2036406, at *14-15, and *Zapmedia*, 2010 WL 8599970, at *12-13—are also inapplicable. For example, in *Tuna Processors*, the Court found that because the claim used past

participles (e.g., "passing the *produced* smoke through a filter" and "cooling the smoke *passed* through the filter"), the claim language required the step of producing the smoke to occur before the steps of filtering the smoke and cooling the smoke. 327 F. App'x at 208-210. Unlike in *Tuna Processors*, here there are no past participles in claim 1 of the '520 or '372 patents. In *Zapmedia*, the claim at issue recited, *inter alia*, the steps of (a) "providing a user with a user account" and (c) "authorizing … a plurality of media player assets with the user account." 2010 WL 2036406, at *14-15. The Court found that the existence of a user account is a prerequisite of step (c), therefore, step (a) must always occur before step (c). *Id*. As explained herein, and in Dr. Coralic's two declarations, that is simply not the case for the "providing" and "storing" required by claim 1 of the '520 and '372 patents.

Finally, Baxter argues that Plaintiffs' construction is improper because it "focuses on how the unit dosage form is transported/moves throughout the hospital" and that a POSA "would understand that 'providing,' in the context of the claims, refers to making the claimed unit dosage form having 'enhanced stability characteristics' available." *Supra* at 20, 34-35. Baxter's argument is nonsensical. It is unclear how Baxter believes that a pharmaceutical product, stored in the pharmacy, can be made available to a clinician, or stored on a hospital floor, unless it is transported/moved throughout the hospital. Thus, Plaintiffs' focus on the intra-hospital transport of vasopressin is not improper; rather, it reflects the clinical reality of the provision, storage, and administration of the claimed vasopressin formulation in unit dosage form (as explained by Dr. Coralic). *See* Coralic Decl. at ¶¶ 14-18, 25-28; Coralic Reply Decl. at ¶¶ 4, 7-10, 12, 17-19.

**b. The file history does not support Baxter's construction**

Baxter also argues that "Par was forced to make a classic narrowing amendment of the claims of the '520 patent … to require the claimed unit dosage form be stored for at least about 24 hours '*after'* it had been provided" and that Par's construction is an "improper attempt to

recapture what was unequivocally disclaimed during prosecution in order to obtain allowance." *Supra* at 23-24. Baxter is wrong. As an initial matter, Par did not "add[] the step of storing after providing to obtain allowance." *Id.* at 30-31. Rather, Par amended claim 1 to recite "storing the unit dosage form for at least about 24 hours" to overcome the prior art. (D.I. 94, Ex. 9 at 17-18.) This is reflected in the Examiner's Reasons for Allowance, which states: "the closes prior art … does [not] teach storing the vasopressin in diluted form for at least about 24 hours prior to administration" and the prior art "teaches away from the step of storing the diluted form for at least about 24 hours." *Id.* at 18.

Further, the amendment to claim 1 did not require storing the unit dosage form "'after' it had been provided." As Baxter is well aware, no such language was included in claim 1. Instead, the amendment recited the following:

> The application has been amended as follows:
>
> In claim 16, line 12, after "b)", insert
>
> --storing the unit dosage form for at least about 24 hours at from about 0.1 units/ml to about 1 unit/ml of vasopressin or a pharmaceutically-acceptable salt thereof; and
>
> c) after the storing,–.

(D.I. 94, Ex. 9 at 17.) As is readily apparent, applicants amended claim 1 to include the language "***storing*** the unit dosage form for at least about 24 hours at from about 0.1 units/ml to about 1 unit/ml of vasopressin or a pharmaceutically-acceptable salt thereof; and c) ***after the storing***,--." (*See* D.I. 94, Ex. 9 ('520 Patent File History Excerpts, Notice of Allowance, Examiner's Amendment) at 176 (emphasis added).) Had Applicants intended for "storing" to always follow "providing" they could have simply included a requirement that the "storing" occurs "*after* the providing," but no such amendment was made. Thus, Par did *not* make a narrowing amendment

of the claims of the '520 patent to require the claimed unit dosage form be stored for at least about 24 hours "*after*" it had been provided. In other words, there was no unequivocal disavowal of claim scope.

Moreover, Baxter's argument regarding Par's suggestion to "add[] a step of storing the vasopressin for at least about 24 hours after providing the unit dosage form and before administering" misunderstands that file history. *Supra* at 23-24 (citing D.I. 94, Ex. 9 at 10). This statement by Par is included in an Examiner-Initiated Interview Summary. Notably, this statement in the Interview Summary is not in quotations because it simply reflects a general summary of the interview, not the verbatim language used by Par during the Interview. Further, the patentee's suggestion to add a "storing" requirement after "providing" the unit dosage form and before "administering" the unit dosage form does not relate to the *order* in which these actions *must* be performed, rather it simply reflects where the amended language should be inserted into the claim. (D.I. 94, Ex. 9 at 10; *see also* Coralic Reply Decl. ¶ 14.) This is also readily apparent from the plain language of claim 1 of the '520 patent, which does *not* include the phrase "after the providing, storing." (*See* D.I. 94, Ex. 1, claim 1.)

Baxter also overreads the Notice of Allowance for the '520 patent arguing that (i) the "Examiner refers to the time period between when the vasopressin formulation is first made available at its administration concentration … and when the vasopressin formulation must be discarded as 'storing'" and (ii) the "Examiner considered the first time that the claimed unit dosage form is made available as the 'providing' step." *Supra* at 24-26. Neither of these assertions is accurate. The Examiner's Reasons for Allowance do not concern the *order* of the "providing" and "storing". (*See* D.I. 94, Ex. 9 at 18.) In fact, the Reasons for Allowance do not even use the term "providing." (*Id.*) Instead, the Examiner's two reasons were focused on, *inter alia*, the fact that the

prior art did not teach "storing the vasopressin in diluted form for *at least about 24 hours* prior to administration." *Id*. (emphasis added). Baxter also incorrectly asserts, with reference to the Notice of Allowance, that "the Examiner granted the '520 patent based on the shelf life of the administrable vasopressin unit dosage form … and not based on the tracking of the amount of time the vasopressin unit dosage form is sitting in one particular location … ." *Supra* at 25-26. Again, the comparison of shelf life and tracking the location of the vasopressin product is nothing more than an attempt to distract from the issues. The '520 patent was allowed because it could be stored for greater than 24 hours in the diluted form, and this was unexpected given the prior art concentrated vasopressin product had to be discarded 18 hours after dilution at room temperature or 24 hours if refrigerated. (D.I. 94, Ex. 9 at 18.) These reasons for allowance do not speak to the *order* of the "providing" and "administering." (*See* Coralic Reply Decl., ¶ 14.) And nothing in the prosecution history evinces a clear disavowal of claim scope, which would permit straying for the ordinary meaning or the "providing … storing … administering" term.

Baxter also argues that the prosecution histories of the related '006, '422, '649 and '575 patents further buttress Baxter's proposed construction because the same amendment requiring storage for at least about 24 hours was made to overcome the prior art. *Supra* at 26-28. However, for the same reasons as discussed above, such amendments do not support requiring that "providing … storing … administering" be performed in that particular order. Baxter also attempts to make hay of the fact that the related patents were amended not only to require storing, but also the step of providing. *See* Coralic Reply Decl., ¶ 14. However, much as with the '520 patent, none of the related claims were amended to recite "*after the providing*, then storing." Had the patentee intended that the "providing" and "storing" be performed in a certain order, they could have done so—much as they did with "administering". However, this was not done.

**c. Unlike Baxter's proposed construction, Plaintiffs proposed construction is faithful to the intrinsic record**

Baxter argues that Plaintiffs' proposed construction "ignores the claim language patent specification, prosecution history and logic." Baxter's argument fails for at least the reasons set forth in Plaintiffs' Opening Claim Construction Brief. *Supra* at 8-15. Baxter further argues that Par's proposed construction for "providing" and "storing" are internally inconsistent. *Supra* at 29. Not so. Plaintiffs do not believe this term needs to be construed as it would be readily understood by a skilled artisan, and, as Dr. Coralic explained, a POSA would recognize that in the ordinary course, vasopressin products will be provided (e.g., made available, supplied, furnished) and stored multiple times in multiple different places during the time between when they are manufactured and when they are administered to patients. Coralic Decl. ¶¶ 14-18, 25-28; Coralic Reply Decl. ¶¶ 4, 7-10, 12, 17-19. Thus, there is no internal inconsistency for the "providing" and "storing" required by the '520 and '372 patents.

**d. A skilled artisan would understand that "providing, … storing, … administering" need not be performed in that order**

Baxter asserts that intrinsic records demonstrates that the claimed "providing," "storing" and "administering" must take place in that order and therefore "there is no reason for the court to rely on the Coralic Declaration." *Supra* at 20. For at least the reasons discussed above, the intrinsic record does not support Baxter's construction, which is further confirmed by Dr. Coralic's declarations. *See* Coralic Decl. ¶¶ 14-18, 25-28; Coralic Reply Decl. ¶¶ 4, 7-10, 12-19. Baxter also argues that the Coralic Declaration "is at odds with" the intrinsic record. *Supra* at 40. However, Baxter fails to provide any support for this argument—thus, it is entitled to no weight. *Id.*

Next, relying on its expert, Dr. Freudiger, Baxter asserts that a POSA would understand that "the 'providing' step refers to when the claimed vasopressin unit dosage form is first made available in the claimed concentration, such as when it is manufactured by a pharmaceutical

company or compounded in a hospital pharmacy" and would consider "the claimed 'storing' step to be the time period between providing and administering the unit dosage form." *Supra* at 40-41. Baxter's argument takes a 30,000-foot view of "providing, … storing, … administering" without making any attempt to understand the clinical realities of the provision, storage, and administration of the claimed vasopressin unit dosage form. Notably, while Baxter acknowledges that "both experts generally agree on the various routes of intra-hospital movement of pharmaceuticals," *Id.*, Baxter's arguments conveniently ignore that this "intra-hospital movement" can, and often does, include numerous instances of "providing" and then "storing" or "storing" and then "providing". *See* Coralic Decl. at ¶¶ 14-18, 25-28; Coralic Reply Decl. ¶¶ 4, 7-10, 12, 17-19. In short, in an effort to support its litigation-inspired construction, Baxter and its expert take a myopic view of how pharmaceutical drug products are stored, provided, and administered in a clinical setting and should not be credited.

Finally, Baxter argues that a POSA would understand that "the storing time must be shorter than the shelf life to avoid wasting medicines." *Supra* at 34. This is nothing more than a misguided attempt to muddy the waters and does not speak to whether the claimed "providing," "storing," and "administering" must be performed in that order. And, as Baxter acknowledges, "drug products are always marked with their expiration date." *Id*. Thus, a POSA would understand when the vasopressin drug product could no longer be safely administered, i.e., was expired, without any regard for the *order* of the "providing" and "storing".

**4. Defendant's Sur-Reply Position**

Baxter's proposed construction requires that the claimed "providing," "storing," and "administering" steps take place in that order. In contrast, Par and Dr. Coralic say that the "providing" step can occur at *any* time because it has *any* of the multiple meanings Par wants. According to Par, "providing" can be any or all of shipping the product from a manufacturer (like

Baxter) to a distributor, hospital or acute care facility, or any entity in between; transferring the unit dosage form within a hospital or acute care facility, from the receiving department to the central pharmacy and to decentralized pharmacies within the facility; and/or moving the dosage form from the pharmacy to an automated dispensing cabinet, hospital bed, nurse or other care provider. (*See supra* at 9-10, 12-13, 35; *infra* at 69-70; Coralic at ¶¶ 26-27; Coralic Reply at ¶¶ 7-8, 12, 18)[13].

But the Patents-in-Suit are not supply chain and hospital logistics patents. They are patents about the design of vasopressin dosage forms that Par says are inventive over the prior art because they can be stored for at least about 24 hours before being used to treat patients. Baxter's proposed construction is consistent with that understanding, as well as the claim language, specification, prosecution history, and logic.

**a. Par ignores the intrinsic evidence because it supports Baxter's proposed construction**

**i. The claim language supports Baxter's proposed construction**

Starting with the claim language itself, logic requires that a unit dosage form must be first provided before it can be stored or administered. As such, the "providing" … "storing" … "administering" terms must take place in their written order. Par tries to avoid this conclusion by advocating for its overly broad view on the "providing" and "storing" terms. Par's positions are inconsistent with how a POSA would understand those terms in the Patents-in-Suit. (*See supra* at 20, 30-31, 33-34; Freudiger at ¶¶ 35-37, 39, 43-45). The claims are directed towards the "providing," "storing," and "administering" of a unit dosage form containing specific ingredients

[13] As Baxter pointed out in its Answering Brief and unrebutted by Par, under Par's overly broad construction of the "providing" step, the providing step would still take place first. (*Supra* at 29-30).

and/or degradants in specific concentrations at specific pHs that can be stored for at least about 24 hours. (*See* '520 patent at claim 1; '372 patent at claim 1). Meanwhile the claims are silent as to the movement of pharmaceuticals throughout hospitals. (*Id.*). As such a POSA would understand that the claims, which focus on the attributes of the unit dosage form and not their movement, support Baxter's view of the "providing" term.

Par further argues that the inclusion of ordinal letters in the '520 patent somehow does not speak to the order of the steps because, prior to amendment, the claims recited "ordinal letter 'a)' for the providing step and ordinal letter 'b)' for the administering step, despite the fact that the administering step *necessarily* occurs after the providing step." (*Supra* at 41). This supports Baxter's construction. Using "a)" to define the first step in a method and "b)" to define the second step clearly demonstrates that the ordinal letters indicate the order of the method steps.

Par argues that the "after the storing" claim language is not superfluous because it was introduced as part of an amendment to overcome prior art. (*Supra* at 37). Yet by Par's own admission "it is *necessarily* true that the 'administering' step comes after the … 'storing' step[]—because logically the unit dosage form cannot be stored or provided to others after it has been injected into the body of a patient." (*Supra* at 13; *see also supra* at 41). As such, the "after the storing" language is absolutely superfluous. By Par's own admission, it could be removed from the claim without altering the claim meaning. In fact, as Par admits, while the '520 patent originally only contained the "providing" and "administering" steps and no language explicitly stating the order of those two steps, a POSA would have still understood that the claims require that the providing step take place before the administering step. (*Supra* at 41).

**ii. The specification supports Baxter's proposed construction**

Par attempts to distance itself from its own specification by saying that the 110 listed embodiments, each of which include a "providing" step before a "storing" step, "merely recite potential embodiments using the same structure and verbiage as the claims," and argues that nothing in the embodiments "requires by logic or language that the 'providing' *must always* occur before the 'storing.'" (*Supra* at 38). Par should be held to the disclosures in its patent.

Dr. Coralic attempts to distract away from this voluminous evidence by stating that, in his experience, "the concentrated vasopressin product that is removed from storage and diluted is then 'provided' to a healthcare professional for administration." (Coralic Reply at ¶ 16). However, the "providing" step in these embodiments expressly does not refer to the step of giving the unit dosage form to healthcare professionals for administration, because what is administered is not the concentrated unit dosage form from the "providing" step. (*See supra* at 21, 34; Freudiger at ¶¶ 39-40). In fact, the administering step states "d) administering the ***diluted unit dosage form***." ('520 patent at 16:17) (emphasis added).

Par and Dr. Coralic also ignore that nowhere in the 156-page specification of the '520 patent mentions the words "hospital,"[14] "acute care facility," "pharmacy"[15] or "automated dispensing machines," all of which are central to Dr. Coralic's theory that "providing" refers to movement of the drug product to and through the relevant facility. They also ignore that the specification is replete with examples of different dosage forms and their properties and stability. (*See e.g.*, '520 patent at 61:7-163:3 (Examples); 61:9-65:9 (analysis of "an illustrative formulation

---

[14] Except in the title of the reference "Wellington regional hospital, intensive care unit," cited on page 6 under Other Publications. ('520 patent at page 6).

[15] Except in the title of the reference "The Science and Practice of Pharmacy," used to describe pharmaceutically acceptable ingredients for use in the claimed unit dosage form. ('520 patent at 56:15-18).

of vasopressin"), 65:10-20; 65:21-44, 65:45-59; 65:60-66:52, 66:54-66 ("Example 6: Illustrative Vasopressin Formulation for Clinical Use"), 109:40-110:41, 110:43-115:35, 115:36-117:25).

#### iii. The prosecution history supports Baxter's proposed construction

As for the prosecution history, Par attempts to explain away the clear statements authorizing the claims to be amended to include the step of "storing" the vasopressin "*after* providing the unit dosage form and before administering." ('520 patent FH at 10; *see also supra* at 23-24). Par tries to side-step this fact by saying that this language "does not relate to the order in which these actions must be performed, rather it simply reflects where the amended language should be inserted into the claim." (*Supra* at 44). Par's argument makes no sense: If the order of the claim limitations does not matter, then why would the Examiner care where the limitation is physically inserted into the claim? The Examiner required the amendment to remove embodiments of the claims wherein the unit dosage form is diluted to the claimed concentration (*i.e.*, "provided") just prior to administration. Thus, the Examiner required that the storing come *after* the providing step (*i.e.*, the manufacture or dilution of a concentrated vasopressin product). This is a clear indication of the Examiner's view—now in the public record—that providing must come first.

Par also ignores that this same narrowing amendment occurred in four related patents which did not originally include any providing step, and in which Par specifically included the step of providing the unit dosage form *before* the storing. (*Supra* at 26-27; '006 patent FH at 3,10; '422 patent FH at 3, 10; '649 patent FH at 3, 10; '575 patent FH at 3, 10). Par attempts to handwave this additional evidence away by saying that the final claims do not actually include the phrase "storing the vasopressin for at least about 24 hours after providing … and before administering." (*Supra* at 45). However, this argument holds no weight because plain language requires that steps be performed in order. (*See* Section III.A.2.a).

Par argues that the Notice of Allowance does not support Baxter's construction because the "'520 was allowed because it could be stored for greater than 24 hours in the diluted form" whereas the prior art Vasostrict had to be discarded within 24 hours of being diluted if refrigerated or 18 hours if stored at room temperature. (*Supra* at 45). This is exactly Baxter's point. The Examiner differentiated the current invention from the prior art because it could be stored for longer than 24 hours *after* being provided (first made available) at the administration concentration, unlike the prior art Vasostrict Product which had to be used or discarded within 24 hours of having been diluted. (*See supra* at 25). This is consistent with the "storing" step, which is unconcerned with where the "unit dosage form" is located or whether it is stationary during that time. Par does not argue otherwise. As such, a POSA, given the Notice of Allowance would understand that the "providing" step precedes the "storing" step.

Par claims that its focus on the intra-hospital transport of vasopressin is not improper because it "reflects the clinical reality of the provision, storage, and administration of the claimed vasopressin formulation in unit dosage form." (*Supra* at 42). The claims of the '265 patent prove this false. The claims of the '265 patent, like those of the '372 and '520 patents, are drawn to administration of the claimed vasopressin unit dosage form, but they do not include a "providing" step. (*See* '265 patent at claim 1 (claiming a method wherein the claimed unit dosage form ends up in the hands of a clinician for administering to a patient despite no "providing" step)). As discussed above a POSA reviewing the Patents-in-Suit would understand that they are focused on vasopressin formulations with enhanced stability, and not the intra-hospital movement of pharmaceuticals as alleged by Par and Dr. Coralic. (*See* Section III.A.4.a.i; *see also* Section III.A.4.a.ii; Freudiger at ¶ 43; *supra* at 20, 30-31, 33-34, 63-64). As such Par's overly broad view of the "providing" and "storing" steps should be rejected.

Dr. Coralic provided a second declaration in which he doubles down on his broad view of the claimed steps. Dr. Coralic states that nothing in the claim language requires an order to the steps because a skilled artisan "would understand that vasopressin products will be 'stored' in different places at different times in the ordinary course of their journey from the pharmacy to their eventual use" and "would not typically look to the shelf life of the product to determine the *order* of the 'providing' and 'storing' steps." (Coralic Reply at ¶ 12). These arguments are unsupported by the intrinsic evidence. As previously explained, the claim language focuses on the composition of the unit dosage form and not its movement and a POSA would be accustomed to thinking in terms of the shelf life of medicines and *not how long they have been sitting in one particular location*. (*See supra* at 34). Dr. Coralic further states that the Interview Summary focuses on "where to insert the 'storing' step." (Coralic Reply at ¶ 14). However, this ignores that Par made the same amendment to four related patents which did not include a providing step. (*See supra* at 26-27, 51). Finally, Dr. Coralic argues that, in his experience, the prior art vasopressin products are "provided" to healthcare professionals after dilution. (Coralic Reply at ¶ 16). However, as discussed earlier, whatever unit dosage form Dr. Coralic claims is given to a healthcare professional is expressly not the unit dosage form from the "providing" step in the specification. (*See* Section III.A.4.a.ii). His opinions should thus be rejected as contrary to the intrinsic evidence. *Phillips*, 415 F.3d at 1318. Further, because the intrinsic evidence is clear, there is no reason for the Court to look to extrinsic expert declarations. *Vitronics*, 90 F.3d at 1583.

**b. Par's other arguments are unpersuasive**

Par argues that *Hytera* is inapplicable because the patentee conceded that some of the steps had to occur in order only challenging whether one claimed step could occur before another. (*Supra* at 37-38). That is not a distinction from this case. In *Hytera* the parties disagreed over whether the claimed "preparing" step must occur before the claimed "determining" step, as in the written order

of the claims, and agreed that the other steps must be performed in their written order. Similarly, here the parties disagree on whether the claimed "providing" step must occur before the claimed "storing" step, as written in the claims, and agree that the "administering" step must be performed in its written order (last). *See Hytera*, 841 F. App'x at 218-19. Further, as in *Hytera*, the providing step occurs before the storing step in all of the embodiments in the specification. *Id.* ("[H]ere, the only embodiments are consistent with the plain meaning of the claim in the order that is written, and we thus decline to construe the claim as allowing deviation from that order.").

Par argues that *Amgen* is not applicable to this situation because the specification in *Amgen* made clear that the step of "washing" the separation matrix takes place before the step of "eluting" the protein from the separation matrix. (*Supra* at 36). Par is mistaken. Amgen argued that Sandoz's process, which only applies one solution to the matrix to accomplish the washing and eluting steps, infringed the asserted claims. The Federal Circuit disagreed, finding that the step of washing must take place before eluting because "the claim language logically requires that the process steps lettered (a) through (g), be performed in sequence" and because "washing and eluting are consistently described in the specification as separate steps performed by different solutions." *Amgen*, 923 F.3d at 1028. These reasons also apply here. Logic dictates the steps occur in their written order and the specification consistently describes providing as taking place before storing.

Par attempts to distinguish *Chiesi*, *Mantech* and *Zapmedia* by arguing that, unlike in those cases, logic does not dictate the order of the "providing" and "storing" steps. (*Supra* at 36, 41-42). However, Par's arguments are based on Par's view of the "providing" and "storing" steps, which is unsupported by the intrinsic evidence. A POSA would understand the "providing" step as making the claimed vasopressin unit dosage form first available with the claimed attributes and thus that the "providing" step logically must precede the "storing" step. (*See supra* at III.A.4.a).

Par fails to respond to the fact that their construction is ambiguous, confusing, and does not help resolve issues of infringement. (*Supra* at 29-31). By skirting this issue now, Par improperly leaves it for the Court to resolve later and their constructions should be rejected. (*Id.*).

### B. "unit dosage form"

#### 1. Plaintiffs' Opening Position

| Plaintiffs' Proposed Construction | Baxter's Proposed Construction |
|---|---|
| No construction necessary<br><br>In the alternative, plain and ordinary meaning, which is a unit dosage form as recited in the claim | Construction necessary only because the parties appear to dispute the plain and ordinary meaning, which is a unit dosage form that has the properties recited in the claim at all times prior to being administered |

##### a. Issue Presented

The term to be construed is three words: "unit dosage form." The Parties seemingly agree on the ordinary meaning of these three words, as neither Plaintiffs nor Baxter use different words to re-state this term. D.I. 94 (JCCC) at A-3. Indeed, Plaintiffs assert that no construction is necessary[16] and Baxter proposes a construction using the exact words "unit dosage form." *Id*. That should end the inquiry—the Court should give this term its ordinary meaning, and need not provide an express construction at all given that the words are clear enough on their face and there appears to be no dispute about what they mean.

The problem, however, is that Baxter seeks to go beyond the ordinary meaning of this common term by adding on unnecessary and unwarranted surplusage. More specifically, while Baxter's proposed construction parrots the language of the claims, i.e., recites the exact term "unit

[16] To the extent the Court wishes to provide an express construction, Plaintiffs have also provided a construction in the alternative, which also uses the exact words "unit dosage form." *See* JCCC at A-3.

dosage form," it then seeks to insert an unsupported temporal limitation: "that has the properties recited in the claim *at all times* prior to being administered." *See* D.I. 94 at A-3 (emphasis added). The Court should reject Baxter's add-on to the ordinary meaning as inconsistent with the plain language of the claims and unsupported by the intrinsic record.

**b. Background**

It is well-settled that narrowing constructions—such as Baxter's proposal here for "unit dosage form"—are appropriate in only two circumstances: (1) where the patentee acts as his own lexicographer and clearly defines the term in question; or (2) where the patent and/or prosecution history provides an unmistakable disavowal of claim scope. *See, e.g., Hill-Rom Serv.*, 755 F.3d at 1371; *Thorner*, 669 F.3d at 1365; *Akamai*, 805 F.3d at 1375-76.[17] Neither exception applies here, and Baxter cannot overcome the heavy presumption that this term should be afforded its ordinary meaning. *See Aventis Pharms.*, 715 F.3d at 1373.

**c. Argument**

The crux of the parties' dispute is whether "unit dosage form" should be construed to require that the unit dosage form "has the properties recited in the claim *at all times* prior to being administered." *See* D.I. 94 (JCCC) at A-3 (emphasis added). It should not. Baxter's construction ignores the plain language of the claims and inserts words into the claims where none exist, and none are warranted.

Each asserted claim of the Patents-in-Suit recites a method of increasing blood pressure in a human in need thereof, involving intravenously administering to a patient "a unit dosage form." (D.I. 94, Ex. 1 ('520 patent) at claims 1, 4-9, and 13; D.I. 94, Ex. 2 ('265 patent) at claims 1-4, 7-

---

[17] *Phillips*, 415 F.3d at 1312-13 (absent lexicography or disavowal, claim terms are to be given their "ordinary and customary meaning," which is "the meaning that the term would have to a [POSA] at the time of the invention").

14, and 16; D.I. 94, Ex. 3 ('372 patent) at claims 1-3 and 6-13.) The claims go on to recite that "the unit dosage" form that is intravenously administered to the patient has certain recited properties:

| '520 Patent | '265 Patent | '372 Patent |
|---|---|---|
| A method of increasing blood pressure in a human in need thereof, the method comprising:<br>a) **providing a unit dosage form for intravenous administration, wherein the unit dosage form comprises**:<br>i) from about 0.1 units/mL to about 1 unit/mL of vasopressin or a pharmaceutically-acceptable salt thereof;<br>ii) from about 1 mM to about 10 mM acetate buffer;<br>iii) 0-2% vasopressin degradation products;<br>iv) sodium chloride; and<br>v) water; and<br>b) **storing the unit dosage form** for at least about 24 hours **at from about** 0.1 units/ml to about 1 unit/ml of vasopressin or a pharmaceutically-acceptable salt thereof; and<br>c) after the storing, **administering the unit dosage form** to the human by intravenous administration, **wherein the unit dosage form that is administered to the human comprises** from about 0.1 units/mL to about 1 unit/mL of vasopressin or the | A method of increasing blood pressure in a human in need thereof, the method comprising treating the human with a kit, wherein the kit comprises:<br>a) a container, wherein the container is a drip-bag; and<br>b) **a unit dosage form** contained in the drip-bag, **wherein the unit dosage form comprises**:<br>i) vasopressin or a pharmaceutically-acceptable salt thereof at a concentration of about 0.1 units/mL to about 1 unit/mL;<br>ii) from about 1 mM to about 10 mM acetate buffer;<br>iii) dextrose, sodium chloride or combination thereof; and<br>iv) water,<br>**wherein when iii) is dextrose, the unit dosage form has** a pH of from about 3.6 to about 3.9,<br>**wherein when iii) is sodium chloride, the unit dosage form has** a pH of from about 3.5 to about 3.7, and<br>**wherein when iii) is a combination of dextrose and sodium chloride, the unit dosage form has** a pH of from about 3.7 to about | A method of increasing blood pressure in a human in need thereof, the method comprising **providing a unit dosage form, wherein the unit dosage form consists essentially of**:<br>a) from about 0.1 units/mL to about 1 unit/mL of vasopressin or a pharmaceutically-acceptable salt thereof;<br>b) a pH-adjusting agent;<br>c) an acetate buffer;<br>d) about 0.9% NaCl; and<br>e) water;<br>**wherein the unit dosage form has** a pH of from about 3.5 to about 3.7, **storing the unit dosage form** for at least about 24 hours **at from about** 0.1 units/mL to about 1 unit/mL vasopressin or the pharmaceutically-acceptable salt thereof;<br>after the storing, **intravenously administering the unit dosage form** to the human;<br>**wherein the unit dosage form that is administered to the human comprises** from about 0.1 units/mL to about 1 unit/mL of vasopressin or the pharmaceutically-acceptable |

| | | |
|---|---|---|
| pharmaceutically-acceptable salt thereof; **wherein:**<br><br>**the unit dosage form has** a pH of 3.4 to 3.8; the administration provides to the human from about 0.01 units of vasopressin or the pharmaceutically-acceptable salt thereof per minute to about 0.1 units of vasopressin or the pharmaceutically-acceptable salt thereof per minute; and the human is hypotensive. | 3.8;<br><br>wherein the treating the human with the kit comprises:<br><br>a) **storing the unit dosage form** for at least about 24 hours at a concentration of **from about** 0.1 units/mL to about 1 unit/mL of vasopressin or the pharmaceutically-acceptable salt thereof; and<br><br>b) after the storing, **administering the unit dosage form to the human by intravenous drip wherein the unit dosage form that is administered to the human comprises** from about 0.1 units/mL to about 1 unit/mL vasopressin or the pharmaceutically-acceptable salt thereof. | salt thereof. |

(*See* D.I. 94, Ex. 1 ('520 patent) at claim 1 (emphasis added); D.I. 94, Ex. 2 ('265 patent) at claim 1 (emphasis added); D.I. 94, Ex. 3 ('372 patent) at claim 1 (emphasis added).) Plaintiffs' reading of the plain language of the claims is straightforward—the unit dosage form has the properties as recited in the claim. There is no ambiguity. As such, Plaintiffs respectfully submit no construction of the term "unit dosage form" is needed.

Conversely, Baxter contends that the "unit dosage form" must have the properties recited in the claim "at all times prior to being administered." But the plain language of the claims does *not* support this temporal limitation. And if the inventors had wanted to include a temporal constraint they knew how to do so. As discussed, claim 1 of the '520 patent makes clear that the "administering" step must occur "*after* the storing" step. (D.I. 94, Ex. 1 ('520 patent), claim 1 (emphasis added); *see also* D.I. 94, Ex. 2 ('265 patent), claim 1; D.I. 94, Ex. 3 ('372 patent),

claim 1.) This indicates that while the patentees knew how to draft the claims to include a temporal limitation (i.e., "*after* the storing"), the patentees choose *not* to include the temporal limitation "at all times" in these claims. Accordingly, Baxter, should not be permitted to insert a temporal limitation into the asserted claims of the Patents-in-Suit where none is warranted. To do so would contravene one of the fundamental rules of claim construction: that "[i]n construing claims, the analytical focus must begin and remain centered on the language of the claims themselves, for it is that language that the patentee chose to use to 'particularly point out and distinctly claim the subject matter which the patentee regards as his invention.'" *Interactive Gift*, 256 F.3d at 1331.

The patent specifications further confirm that the claims mean what they plainly say, and do not require that the unit dosage form has the recited properties "at all times prior to being administered." (*See, generally*, D.I. 94, Ex. 1 ('520 patent).) In fact, rather than having the recited properties "at all times prior to being administered," the specifications disclose that certain properties of the unit dosage form are dependent upon storage conditions (e.g., temperature and time) and can be assessed at various time points. For example, the specifications state that "in some embodiments, the invention provides a method of increasing blood pressure in a human in need thereof … wherein the pharmaceutical composition [in a unit dosage form] exhibits *no more than about 1% degradation* of vasopressin or the pharmaceutically acceptable salt thereof *after the storage at 5°C for about 1 month* …." *Id*. at col. 2:5-21 (emphasis added); *see also id*. at col. 2:22-38. Similarly, the specifications state: "A formulation or *unit dosage form described herein can exhibit*, for example, about [a specified]% *degradation over a specified period of time*. The degradation of a formulation or unit dosage form disclosed herein can be assessed *after about 24 hours, about 36 hours, about 72 hours, about 96 hours, about 1 week … about 1 year … about 2 years … or about 3 years of storage*. The degradation of a formulation or unit dosage form

disclosed herein can be assessed at a temperature of, for example about [a specified temperature]°C." *Id*. at col. 11:34 – col. 12:32 (emphasis added). The specifications further state: "The present invention provides a method of increasing blood pressure in a human in need thereof, the method comprising: a) providing a pharmaceutical composition for intravenous administration comprising: … and b) storing the pharmaceutical composition at 2-8°C, for example 5°C, for at least 4 weeks; and c) intravenously administering the pharmaceutical composition … wherein the pharmaceutical composition exhibits *less than about 5% degradation after the storage at 2-8°C, for example 5°C, for about 2 weeks*." *Id*. at col. 43:29-45 (emphasis added). Accordingly, the specifications do *not* implicitly or explicitly require that the unit dosage form have "the properties recited in the claim *at all times* prior to being administered," as Baxter proposes. Likewise, nothing in the prosecution histories of the Patents-in-Suit support adding a temporal limitation to the claims. To the contrary, applicants specifically amended claim 1 of the '520 patent to include a temporal limitation: "storing the unit dosage form for at least about 24 hours at from about 0.1 units/ml to about 1 unit/ml of vasopressin or a pharmaceutically-acceptable salt thereof; and c) ***after the storing***,--." (*See* D.I. 94, Ex. 9 at 17 (emphasis added).) That the applicants did not include any other temporal limitations indicates that they did not intend for the limitation "at all times" to be part of the claims.

In sum, the term "unit dosage form," *as drafted*, and in the context of the claims as a whole, would be readily understandable to one skilled in the art and Baxter's narrow construction is not supported by lexicography or disavowal. For at least these reasons, Plaintiffs respectfully submit that the Court should reject Baxter's proposed construction and find that no further construction is necessary. *See, e.g.*, *ActiveVideo*, 694 F.3d at 1326; *Summit 6*, 802 F.3d at 1291. Alternatively, if the Court wishes to provide an express construction, Plaintiffs respectfully submit that the Court

should adopt its proposed language, which reflects the ordinary meaning of the term, consistent with the above-discussed intrinsic record.

### 2. Defendant's Answering Position

The term "unit dosage form" appears in asserted claims 1 and 13 of the '520 patent, asserted claims 1, 2, 7, 12 14 and 16 of the '265 patent and asserted claims 1 and 13 of the '372 patent. (D.I. 94, Ex. 1 ('520 patent); D.I. 94, Ex. 2 ('265 patent); D.I. 94, Ex. 3 ('372 patent)). The parties have proposed the following constructions for the term:

| Par's Proposed Construction | Baxter's Proposed Construction |
|---|---|
| No construction necessary<br>In the alternative, plain and ordinary meaning, which is a unit dosage form as recited in the claim | Construction necessary only because the parties appear to dispute the plain and ordinary meaning, which is a unit dosage form that has the properties recited in the claim at all times prior to being administered |

Baxter's construction of "unit dosage form," requires that the unit dosage form have the properties recited in the claim at all times prior to being administered. This construction is consistent with the plain and ordinary meaning of the claim language and is wholly supported by the intrinsic evidence. In contrast, Par's construction is contradicted by Par's own statements to the Patent Office as well as Par's own proposed construction for the "providing … storing … administering" term.

#### a. The claim language supports Baxter's proposed construction

The plain language of the patent claims support Baxter's proposed construction. Claim 1 of the '520 and '372 patents claim the steps of providing *a* unit dosage form with specific components and characteristics, a step of storing *the* unit dosage form and a step of administering *the* unit dosage form. ('520 patent at claim 1, '372 patent at claim 1; *see also* Section III.A.2.a). Similarly, claim 1 of the '265 patent claims a method of treating a human with a kit comprising a drip-bag comprising *a* unit dosage form with specific components and characteristics, a step of

storing *the* unit dosage form and a step of administering *the* unit dosage form. (‘265 patent at claim 1). The use of “the unit dosage form” in both the “storing” and “administering” steps confirms that they utilize the same unit dosage form that was provided in the previous step and is described in the patent. “Subsequent use of the definite articles ‘the’ or ‘said’ in a claim refers back to the same term recited earlier in the claim.” *Wi-Lan*, 811 F.3d at 462; *Nippon*, 2023 WL 4314485, at *15 (finding that a “claim’s use of the word ‘said’ simply refers back to an earlier phrase in the claim, the scope of the term will be the same as the scope of the earlier language.”).

Further, one of the components comprising the unit dosage form claimed in the ‘520 patent is 0-2% vasopressin degradation products. A skilled person would have understood that the Patents-in-Suit are directed to a method of treating a patient using vasopressin compositions having enhanced stability, and that vasopressin is known to degrade over time. (Freudiger Decl. at ¶¶ 35, 43; *supra* at 2, 59-60; ‘520 patent at 5:50 – 7:10). As a result, they would have understood the unit dosage form claimed in the ‘520 patent—which has enhanced stability, a limitation on the concentration of vasopressin degradants, and is intended for administration to a patient—to refer to the unit dosage form as administered. Further, they would have known that amount of vasopressin degradation products increases over time and will never decrease. Thus, because a unit dosage form must be the same as the unit dosage form, if a unit dosage form has 0-2% vasopressin degradation products when administered, it must also have 0-2% degradation products at all times prior to administration.

Par points to portions of the specification discussing the degradation of vasopressin as evidence that it “disclose[s] that certain properties of the unit dosage form are dependent upon storage conditions.” (*Supra* at 59). However as discussed above, this supports Baxter’s proposed

construction. Par has not and cannot explain how it would be possible for a unit dosage form to have the properties recited in the claim at administration, but not at all times previously.

**b. The specification supports Baxter's proposed construction**

The specification further supports Baxter's proposed construction. Par argues that the specification does not "implicitly or explicitly" require the temporal limitation that the unit dosage form must have the properties recited in the claim at all times prior to being administered. Par's argument lacks merit because the specification confirms that the temporal limitation is inherent in the claims.

In support for their proposed construction, Par cites to examples in the specification wherein the unit dosage form exhibits no more than a specified amount of degradation products after a specific period of storage, and argues that these demonstrate the unit dosage term has no temporal limitation. (*Supra* at 59-60). However, these examples actually support Baxter's proposed construction. The Patents-in-Suit relate to methods of treatment using a vasopressin unit dosage form of enhanced stability. (*Supra* at 2; Coralic Decl. at ¶ 12; Freudiger Decl. at ¶ 43). Because the Patents-in-Suit relate to a method of treatment and a dosage form of enhanced stability, a skilled person would understand the claims to focus on the properties of the unit dosage form that is administered to the patient. As discussed below, this interpretation of the claimed unit dosage form was explicitly confirmed by the applicants during prosecution of the '520 patent. *NTP*, 418 F.3d at 1293; *Microsoft*, 357 F.3d at 1350.

Thus, a skilled person would understand that the claims implicitly contain a temporal limitation—namely, the time from when the unit dosage form is first provided until the time period that it is administered. This is consistent with how a skilled person would interpret the claimed "storing" step, and is supported by the portions of the specification cited by Par. (Freudiger Decl.

at ¶¶ 36, 40-41, 44; ‘520 patent at 2:5-38, 11:34 – 12:32, 43:29-45). As such, the patent specification also supports Baxter’s proposed construction.

**c. The prosecution history supports Baxter’s proposed construction**

The prosecution history of the Patents-in-Suit confirms that Baxter’s proposed construction is correct. During prosecution of the ‘520 patent the examiner rejected the claims as indefinite. In response, Par amended the claims and explained that the “amended claims clarify that *the unit dosage form recited in the claim is the formulation that is administered to the human*.” (‘520 patent FH at 6) (emphasis added). Par, having told the Examiner that the unit dosage form that is administered has the properties recited in the claims, must be held to its words. And because the unit dosage form possesses the properties recited in the claims at the time of administration, a skilled person would understand that it must necessarily possess them at all times prior.

Par cites to the applicants’ addition of the claim language “after the storing, administering,” and argues “[t]hat the applicants did not include any other temporal limitations indicat[ing] that they did not intend for the limitation ‘at all times’ to be part of the claims.” (*Supra* at 60). Again, however, Par again ignores the statements to the examiner in an effort to improperly expand the scope of the claimed invention. Par explicitly told the examiner that the claimed unit dosage form is “the formulation that is administered to the human.” (‘520 patent FH at 6). As discussed above, a skilled person would understand that as a matter of logic, this requires that the unit dosage form described in the “providing” and “storing” steps also matches the formulation described in the “administering” step.

**d. Plaintiffs' proposed construction is inconsistent with their proposed construction of "providing … storing … administering."**

Par's proposed constructions of "unit dosage form" and "providing … storing … administering" are contradictory and should both be rejected for this reason. As discussed above, Par agrees that the administrating step must take place last, but argues that the "providing" and "storing" steps can take place in any order. (*See* Section III.A.2). This position is irreconcilable with Par's position that the unit dosage form does not require the properties recited in the claims at all times prior to administration.

Under Par's logic, the claimed method may start with the "storing" step wherein the unit dosage form does not have the properties recited in the claim. It could then be provided, wherein it must have the properties recited in the claim. And only then the unit dosage form can be administered, during which time the unit dosage form must also have the properties listed in the claim. Thus, a unit dosage form which does not meet the claim requirements can somehow transform into one during the "providing" step without any outside influence or time having passed.

As another example, the unit dosage form may be provided with the claimed properties, then be stored with different properties, and then somehow change back to having properties listed in the claim when administered. These results demonstrate the flaws in Par's proposed constructions.

As shown below, the results are more illogical when multiple "providing" and "storing" steps are included, as allowed by the claims under Par's proposed constructions.

| Claimed Step | Unit Dosage Form |
|---|---|
| Providing | Has claimed properties |
| Storing | Does not have claimed properties |
| Providing | Has claimed properties |

| | |
|---|---|
| Storing | Does not have claimed properties |
| Administering | Has claimed properties |

Even if one ignores Par's explicit statement that the administered unit dosage form has the properties recited in the claims, Par's proposed constructions are still impermissibly at odds with one another. As discussed above, a skilled person would understand that the quantity of vasopressin degradation products is the property of the unit dosage form claimed in the '520 patent that is most likely to change, and that the degradation products may increase over time. (*See* Section III.B.2.a). Thus, a skilled person would have understood that any change to the unit dosage form from the claimed properties would occur during the "storing" step. Yet Par takes the position that the unit dosage form can be provided and then administered with no *intervening* "storing" step. However, Par's proposed construction allows for no time period—during which the properties of the unit dosage form could conceivably change—between the "providing" step (during which the unit dosage form has the properties recited in the claim) and the "administering" step. Accordingly, the unit dosage form that is administered would also necessarily have the properties recited in the claim. As described above, if the unit dosage form that is administered has the properties recited in the claim, the unit dosage form in the preceding steps must also necessarily also have the properties recited in the claims. (*See* Section III.B.2.a).

Because Par's proposed claim constructions "render[] asserted claims facially nonsensical [they] cannot be correct" and the court should refuse to adopt them. *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1255 (Fed. Cir. 2010) (internal quotes omitted); *see also Schoenhaus v. Genesco, Inc.*, 440 F.3d 1354, 1357 (Fed. Cir. 2006); *Bd. of Regents Univ. Tex. v. BENQ Am. Corp.*, 533 F.3d 1362, 1370 (Fed. Cir. 2008) (refusing to adopt a claim construction that "would effect [a] nonsensical result").

### 3. Plaintiffs' Reply Position

Baxter also seeks to go beyond the ordinary meaning of the "unit dosage form" term and again tacks on a non-ordinary requirement—that the unit dosage form must have "the properties recited in the claim *at all times* prior to being administered." *Supra* at 63-64 (emphasis). This is not warranted, and Baxter cannot meet its heavy burden to justify its proposed deviation from the plain and ordinary meanings of the term. *See, e.g., Aventis Pharms.*, 715 F.3d at 1373.

#### a. The claim language and specification do not support Baxter's construction

The parties do not dispute that the claimed "unit dosage form" must have the properties recited in the claims—that flows from a plain reading of the claim. Each claim phrase stands on its own and requires what it requires. In fact, the meaning of the three words "unit dosage form" is not in contention.[18] That should end the inquiry right there. The "unit dosage form" term needs no construction because the claims are straightforward and plainly mean what they say. *See Summit 6*, 802 F.3d at 1291; *see also, e.g., Mentor H/S*, 244 F.3d at 1380; *ActiveVideo*, 694 F.3d at 1326.

Despite there being no dispute as to meaning of the words "unit dosage form," for some unknown reason—likely litigation-inspired—Baxter contends that the "unit dosage form" term should nonetheless be construed to include a non-ordinary temporal limitation, *i.e.*, "a unit dosage form that has the properties recited in the claim *at all times* prior to being administered." *Supra* at 63-64 (emphasis added). But there is no support for this in the intrinsic record, and Baxter's own arguments support that a POSA would plainly understand the meaning of the term "unit dosage form" without need for the temporal limitation. For example, Baxter argues:

- "The use of '**the** unit dosage form' in both the "storing" and "administering" steps confirms that they utilize the same unit dosage form that was provided in the previous step and is described in the patent." Baxter's Br. at 23

[18] Neither Plaintiffs nor Baxter use different words to re-state this term. JCCC at A-3.

(emphasis added).

- The claims recite that the unit dosage form has "0-2% vasopressin degradation products" thus a POSA "would have understood the unit dosage form claimed in the '520 patent" "to refer to the unit dosage form as administered." *Id.* at 23-24.

- "Because the Patents-in-Suit relate to a method of treatment and a dosage form of enhanced stability, a skilled person would understand the claims to focus on the properties of the unit dosage form that is administered to the patient." *Id.* at 24-25.

Each of these arguments supports Par's construction. If a POSA "would have understood" from the plain language of the claims the meaning of unit dosage form and the properties of the unit dosage form, there is no need to add a temporal limitation when (i) there is no ambiguity, *see Summit 6*, 802 F.3d at 1291; *see also, e.g.*, *Mentor H/S*, 244 F.3d at 1380; *ActiveVideo*, 694 F.3d at 1326, and (ii) there is no clear disavowal or lexicography appearing in the intrinsic record. *See, e.g.*, *Hill-Rom Serv.*, 755 F.3d at 1371; *Thorner*, 669 F.3d at 1365; *Akamai*, 805 F.3d at 1375-76.

**b. The file history does not support Baxter's construction**

The file history likewise does not provide a reason to deviate from the plain and ordinary meaning of the term "unit dosage form." Baxter argues that "Par amended the claims and explained that the 'amended claims clarify that the unit dosage form recited in the claim is the formulation that is administered to the human.'" *Supra* at 64. But this simply shows that the claim language itself clarifies what the unit dosage form is and what properties it possesses. This amendment is neither lexicography nor a clear disavowal that would overcome the heavy presumption that disputed term are to be afforded their ordinary meaning. *See Aventis Pharms.*, 715 F.3d at 1373; *Hill-Rom Serv.*, 755 F.3d at 1371; *Thorner*, 669 F.3d at 1365; *Akamai*, 805 F.3d at 1375-76.

**c. Plaintiffs' proposed constructions are not inconsistent**

Baxter next asserts that "Par's proposed constructions … are contradictory and should both be rejected for the same reason." *Supra* at 65. However, Plaintiffs propose that neither the

"providing … storing … administering" term nor the "unit dosage form" term require construction, *see* D.I. 94 (JCCC) at A-1, A-3, thus it is unclear how those positions could be "contradictory."

Turning to the substance of its argument, Baxter spends two pages concocting hypothetical scenarios in an effort to show that Plaintiffs' construction is somehow contradictory. *Supra* at 65-66. But Baxter's summary of Plaintiffs' position is blatantly false. For example, contrary to Baxter's assertions, Plaintiffs do not take the position that the claimed unit dosage form has "different properties" depending on the step of the claim. Instead, Plaintiffs assert that the plain language of the claims is straightforward—the unit dosage form has the properties *as recited in the claim*. *Supra* at 67-68. There is no ambiguity, and thus no construction is necessary. *Id*. This position is not inconsistent with Plaintiffs' argument that the providing and storing of the unit dosage form (with the properties as recited in the claim) need not be performed in the order recited in the claims.

Baxter also incorrectly asserts that "Par takes the position that the unit dosage form can be provided and then administered with no *intervening* 'storing' step." *Supra* at 66 (emphasis in original). That is wholly inaccurate. Plaintiffs do not, and have not ever, proposed that the claimed methods of the patents-in-suit can be performed without a "storing" step. Instead, it has always been Plaintiffs' position that no construction of the "providing … storing … administering" step is required because the ordinary meaning of this term is clear on its face, and there is no basis in logic, grammar, or the specification for requiring that "providing … storing … administering" "must occur" in that order, and, more specifically, that "providing" must occur before "storing", as Baxter asserts.

Indeed, as explained in the Coralic Decl., a POSA would recognize that in the ordinary course, vasopressin products will be provided (e.g., made available, supplied, furnished) and stored

multiple times in multiple different places during the time between when they are manufactured and when they are administered to patients. Coralic Decl. ¶¶ 14-18, 25-28; Coralic Reply Decl. at ¶¶ 4, 7-10, 12, 17-19. For example, the unit dosage form can be stored by the manufacturer, then provided to a shipper/distributor, who can then store the unit dosage form before providing it to the receiving department at a hospital, who then provides the unit dosage form to the hospital's pharmacy staff, who can store it before providing the unit dosage form to clinicians, where it can be stored before being administered to patients. *Id*. Any of those instances of "providing" the vasopressin product can potentially satisfy the "providing" step of the asserted claims, and any of those instances of storage can potentially satisfy the "storing" step. Thus, while it is necessarily true that "administering" comes after "providing" and "storing"—because logically the unit dosage form cannot be stored or provided to others after it has been injected into the body of a patient (i.e., intravenously administered)—that same logic does not apply to "providing" and "storing", which as a matter of both logic and practical reality need not occur in any particular order.

### 4. Defendant's Sur-Reply Position

Par appears to tacitly agree with Baxter as to the meaning of the term "unit dosage form." If the unit dosage form has the attributes in the claims it is unclear why Par is disputing Baxter's construction. If Par does not disagree that the "unit dosage form" has the properties recited in the claims prior to being administered but opposes construction on the grounds it is unnecessary, the Court should construe the claim to preserve clarity going forward. *See, e.g., Thermolife Int'l, LLC v. Myogenix Corp.*, No. 13-651, 2014 WL 12160740, at *6 (S.D. Cal. Dec. 2, 2014) (construing a term to avoid future uncertainty.).

To the extent that Par disagrees that the unit dosage form must have the recited properties at all times prior to being administered, Par's arguments fall flat and it is unclear what Par's position actually is. Par states that "the unit dosage form has the properties as recited in the claim"

and that they "do not take the position that the claimed unit dosage form has 'different properties' depending on the step of the claim." (*Supra* at 69). Yet Par also appears to take the position that the unit dosage form will at all times be either provided, stored or administered. (*See supra* at 9-10, 12-13, 35-36, 69-70; Coralic at ¶¶ 26-27; Coralic Reply at ¶¶ 4, 7-8, 12, 18). Thus it is unclear when during the claimed method Par believes the unit dosage form could not have the properties recited in the claims while still infringing them. For this reason alone, the Court should adopt Baxter's proposed construction.

The inclusion of antecedent terms and stability limitations in the claims supports Baxter's construction, as does the specification's focus on the stability of the unit dosage form. (*Supra* at 61-64). Par makes no attempts to rebut any of these arguments. Instead, Par argues that Baxter's evidence supports Par's construction because "there is no need to add a temporal limitation when (i) there is no ambiguity." (*Supra* at 68). That is clearly untrue as the parties actively dispute the meaning of the "unit dosage form" term. Par's attempts to distract from the intrinsic evidence, which requires that the unit dosage form have the recited properties at all times prior to being administered, should be rejected.

Par's statements during prosecution of the '520 patent require the unit dosage form to have the claimed properties during the administering step, and consequently, at all times beforehand. (*Supra* at 61-64; '520 patent FH at 6). Par does not and cannot rebut this argument; instead Par argues that "this simply shows that the claim language itself clarifies what the unit dosage form is and what properties it possesses." (*Supra* at 68). Par's response makes no sense. Par amended the claims to "clarify that *the unit dosage form recited in the claim is the formulation that is administered to the human*." ('520 patent FH at 6) (emphasis added). Thus, during the

administering step the unit dosage form must have the claimed properties, and a POSA would understand that it must necessarily have the same properties at all times prior. (*Supra* at 61-64).

When confronted with the logical inconsistencies and incompatibilities between their arguments Par deflects by arguing that Baxter is mistaken as to Par's positions. Rather, Par says that it does not take the position that the unit dosage form has different properties depending on the step in the claim and that there is no ambiguity and therefore no construction is necessary. (*Supra* at 69). However, as explained above, neither of these positions make sense in light of Par's own statements and arguments. For these unrebutted reasons, Par's proposed constructions are logically inconsistent and should be rejected. (*Supra* at 65-66).

## IV. CONCLUSION

### A. Plaintiffs' Conclusion

For all the foregoing reasons, the Court should reject Baxter's proposed constructions of the disputed terms, and find that no further construction is necessary. Alternatively, if the Court wishes to provide an express construction for each of the disputed terms, it should adopt the language proposed by Plaintiffs, which reflects the ordinary meaning of the disputed terms.

### B. Defendant's Conclusion

For all of the reasons set forth herein and in the supporting materials submitted herewith, Baxter respectfully requests that the Court adopt Baxter's proposed constructions of the disputed claim terms.

Dated: August 9, 2024

*/s/ Kaan Ekiner*
Kaan Ekiner (#5607)
**COZEN O'CONNOR**
1201 N. Market Street, Suite 1001
Wilmington, DE 19801
(302) 295-2046

*/s/ Philip A. Rovner*
Philip A. Rovner (#3215)
**POTTER ANDERSON & CORROON LLP**
Hercules Plaza
P.O. Box 951
Wilmington, DE 19899

kekiner@cozen.com

*Of Counsel:*

W. Blake Coblentz
Aaron S. Lukas
Kerry B. McTigue
**COZEN O'CONNOR**
1200 19th Street, NW
Washington, DC 20036
(202) 912-4800

Keri L. Schaubert
**COZEN O'CONNOR**
3 WTC, 175 Greenwich Street, 55th Floor
New York, NY 10007
(212) 509-9400

Madison McNulty
**COZEN O'CONNOR**
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, PA 19103
(215) 665-2000

*Attorneys for Plaintiffs Par Pharmaceutical, Inc., Par Sterile Products, LLC and Endo Par Innovation Company, LLC*

(302) 984-6000
provner@potteranderson.com

*Of Counsel:*

Paul J. Molino
Kevin Warner
Katie A. Boda
Greg L. Goldblatt
**RAKOCZY MOLINO MAZZOCHI SIWIK LLP**
6 West Hubbard Street, Suite 500
Chicago, IL 60654
(312) 527-2157

*Attorneys for Defendant Baxter Healthcare Corporation*